Gary L. SAMPLE, on behalf of himself and all persons similarly situated on Counts I, IV and V and on behalf of Nominal Defendant Randall Bearings, Inc., on Counts II and III, Plaintiff,

v.

Kent P. MORGAN, Jeffrey L. Hager, David L. Wierwille, Kenneth C. Harrod, Stephen M. Richmond, Defendants,

and

Randall Bearings, Inc., Nominal Defendant.

C.A. No. 1214–N.

Court of Chancery of Delaware, New Castle County.

Submitted: Nov. 6, 2006.
Decided: Jan. 23, 2007.

Pamela S. Tikellis, Robert J. Kriner, Jr., A. Zachary Naylor, Daniel J. Brown, Chimicles & Tikellis, LLP, Wilmington, DE; for Plaintiff.

Elizabeth A. Wilburn, James J. Merkins, Brian J. McTear, Blank Rome, LLP, Wilmington, DE; Grant S. Palmer, Blank Rome, LLP, Philadelphia, PA, for Defendants.

S. Mark Hurd, Samuel T. Hirzel, Morris, Nichols, Arsht & Tunnel, LLP, Wilmington, DE, for Nominal Defendant.

## OPINION

STRINE, Vice Chancellor.

### I. *Introduction*

Here is a quick summary of this case based on the well-pled facts in the complaint that are relevant to this motion to dismiss.

A board of directors sought approval from its stockholders for a certificate amendment (the "Charter Amendment") and a Management Stock Incentive Plan (the "Incentive Plan") that reduced the par value of the company stock from a dollar per share to a tenth of a cent each and authorized the issuance of up to 200,000 shares for the purpose of "attracting and retaining" key employees. The 200,000 shares represented a 46% increase in the number of shares that were issued and outstanding, from 431,680 as of the time the board approved the Charter Amendment and Incentive Plan, to 631,680 if all the Plan shares were issued. Once issued, those 200,000 shares would account for nearly a third (31.7%) of the company's voting power going forward. The stockholders were told that the decision as to which employees would receive the shares and under what terms and conditions would be made by a committee of non-employee directors. By a modest majority of the shares voted, the stockholders approved the Charter Amendment and the Incentive Plan.

The same day as the stockholder vote, the board formed a Compensation Committee to consider how to implement the Incentive Plan. At its very first meeting, which lasted only 25 minutes, the two member Committee considered a proposal by the company's outside counsel to grant all 200,000 shares to just three employees of the company—the CEO, the CFO, and the Vice President of Manufacturing—all of whom were directors of the company and who collectively comprised the majority of the company's five member board. Let's call these director-defendants the "Insider Majority" for short. Within ten

days, the board approved a version of that proposal at a 20 minute meeting. Although the Committee adopted a vesting schedule for the grants that extended for some years and required the Insider Majority members to remain with the company, all 200,000 shares could be voted by the Insider Majority immediately and would receive dividends immediately. The Committee only required the Insider Majority to pay a tenth of a penny per share. Soon thereafter, the Compensation Committee decided to cause the company to borrow approximately $700,000 to cover the taxes owed by the Insider Majority on the shares they received. In 2004, the company's net sales were less than $10 million and it lost over $1.7 million before taxes. In determining the Insider Majority's tax liability, the Compensation Committee estimated the value of the shares granted to be $5.60 apiece, although the Insider Majority only paid a tenth of a penny per share to get them. Throughout the process, the only advisor to the Compensation Committee was the company's outside counsel.

When the use of the Incentive Plan shares was disclosed, this complaint was filed. The complaint alleges that the grant of the 200,000 shares was a wasteful entrenchment scheme designed to ensure that the Insider Majority would retain control of the company. The complaint alleges that the stockholders' approval of the Charter Amendment and the Incentive Plan were procured through materially misleading disclosures.

In that regard, the complaint notes that the directors failed to disclose that the Charter Amendment and Incentive Plan had resulted from planning between the company's outside counsel—the same one who eventually served as the sole advisor to the committee that decided to award the entire 200,000 shares to the Insider Major-

ity at the cheapest possible price and with immediate voting and dividend rights—and the company's CEO. In memoranda to the CEO, the company's outside counsel articulated that the Incentive Plan was inspired by the Insider Majority's desire to own "a significant equity stake in [Randall Bearings] as incentive for them to grow the company and increase stockholder value, as well as to provide them with protection against a third party ... gaining significant voting control over the company." Those memoranda also contained other material information, including the fact that the company counsel had advised the CEO that a plan constituting 46% of the then-outstanding equity was well above the range of typical corporate equity plans.

Also not disclosed to the stockholders was the fact that the company had entered into a contract with the buyer of the company's largest existing bloc of shares simultaneously with the board's approval of the Charter Amendment and the Incentive Plan. In that contract, the company agreed that for five years it would not issue any shares in excess of the 200,000 shares that were to be issued if the Charter Amendment and Incentive Plan were approved. Thus, the stockholders were not told that they were authorizing the issuance to management of the only equity the company could issue for five years, nor that the board knew that when it approved the contract, the Charter Amendment, and the Incentive Plan all at the same meeting.

Amazingly, the director-defendants have moved to dismiss the complaint on the grounds that it fails to state a claim. In particular, the directors argue that the doctrine of ratification bars the claims in the complaint because the stockholders knew that it was possible under the literal terms of the Incentive Plan for all 200,000 shares to be granted by the board to the Insider Majority for a tenth of a penny

apiece. That the stockholders were not told about the CEO's and company counsel's strategy sessions or that the company would be unable to raise equity capital for five years if the Charter Amendment and Incentive Plan were approved is deemed by the defendants to be a trifling consideration, something only a plaintiffs' lawyer and not a real world investor would consider of moment. Likewise, the directors believe it is ludicrous to think that anyone could conclude that a grant of nearly a third of the future voting power and dividend rights of the company to the Insider Majority for a tenth of a penny per share, upon the advice of a company counsel who had plotted strategy with the CEO, was wasteful.

In this opinion, I deny this frivolous motion to dismiss. The complaint plainly states a cause of action. Stockholders voting to authorize the issuance of 200,000 shares comprising nearly a third of the company's voting power in order to "attract[ ] and retain[ ] key employees" would certainly find it material to know that the CEO and company counsel who conjured up the Incentive Plan envisioned that the entire bloc of shares would go to the CEO and two other members of top management who were on the board. A rational stockholder in a small company would also want to know that by voting yes on the Charter Amendment and Incentive Plan, he was authorizing management to receive the only shares that the company could issue during the next five years due to a contract that the board had simultaneously signed with the buyer of another large bloc of shares.

In view of those non-disclosures, it rather obviously follows that the brief meetings at which the Compensation Committee, relying only the advice of the company counsel who had helped the Insider Majority develop a strategy to secure a large bloc that would deter takeover bids, bestowed upon the Insider Majority all 200,-000 shares do not, as a matter of law, suffice to require dismissal of the claim that those acts resulted from a purposeful scheme of entrenchment and were wasteful. The complaint raises serious questions about what the two putatively independent directors who comprised the Compensation Committee knew about the motivation for the issuance, whether they were complicitous with the Insider Majority and company counsel's entrenchment plans, and whether they were adequately informed about the implications of their actions in light of their reliance on company counsel as their sole source of advice.

As important, the directors do not explain how subsequent action of the board in issuing shares to the Insider Majority could cure the attainment of stockholder approval through disclosures that were materially misleading. To that point, the directors also fail to realize that the contractual limitation they placed on their ability to raise other equity capital bears on the issue of whether the complaint states a claim for relief. Requiring the Insider Majority to relinquish their equity in order to give the company breathing room to issue other equity capital without violating the contract is a plausible remedy that might be ordered at a later stage.

Finally, although the test for waste is stringent, it would be error to determine that the board could not, as a matter of law, have committed waste by causing the company to go into debt in order to give a tax-free grant of nearly a third of the company's voting power and dividend stream to existing managers with entrenchment motives and who comprise a majority of the board in exchange for a tenth of a penny per share. If giving away nearly a third of the voting and cash flow rights of a public company for $200 in

order to retain managers who ardently desired to become firmly entrenched just where they were does not raise a pleading-stage inference of waste, it is difficult to imagine what would.

For these and other reasons, the motion to dismiss is denied. Because it is obvious that the directors cannot prevail on a motion for summary judgment and have already wasted the resources of the plaintiffs and the court with a groundless dismissal motion and improper omissions from discovery, the parties shall collaborate on a schedule for the completion of discovery, the filing of trial briefs, and a trial.

## II. *Factual Background*

These are the facts as pled in the second amended complaint of Plaintiff Gary L. Sample, who has been a stockholder of Randall Bearings since 1996.[1]

The company on whose behalf this derivative action is brought is Randall Bearings, Inc. Randall Bearings is a manufacturer of bronze bearings, bronze brushings, and custom bronzed machine parts that incorporated in Delaware in 1918. From its formation through 2003, the company was headed by the Zimmerman and Dickerson families.[2] During that time, Randall Bearings enjoyed enough success to continue operations and to pay dividends to its shareholders beginning in 1988. But, the stock price of the company was unable to keep pace with inflation. The company operated at a net loss in 2000, rebounded to marginal profitability in 2001, then slid back into the red, losing over $500,000 in 2002.[3]

In 2002, Randall Bearings installed new management. That management was led by the Insider Majority, which was comprised of: defendant Kent P. Morgan, who was Chairman and Chief Executive Officer; defendant David L. Wierwille, who was Treasurer and Chief Financial Officer; and defendant Jeffrey L. Hager, who was Vice President of Manufacturing. Under the new management, revenues and profits grew with the company obtaining record sales of $9.8 million in 2004.[4]

At the beginning of this evolution, in May 2002, the Randall Bearings board of directors consisted of six members—Bruce Dickerson and his wife Susan Dickerson, defendants Morgan and Hager, defendant Kenneth C. Harrod, a retired officer of the company, and Robert Harris. Bruce Dickerson served as Chairman, and owned or controlled 127,442 shares (approximately 29%) of the outstanding shares of Randall Bearings common stock.[5]

At its annual meeting on May 28, 2002, the board discussed a plan of transition and succession in the event of Bruce Dickerson's death. As a result of these discussions, the board resolved that upon Bruce Dickerson's death, his wife Susan would replace him on the Executive Committee and Morgan would become the next Chairman. Further, the board decided to enter into an agreement with Morgan whereby Morgan would have a right of first refusal to purchase the Randall Bearings stock held or controlled by the Dickerson family. The company would have a right of refusal secondary to Morgan's right in the event of a sale. Finally, the board agreed to hire Susan Dickerson as an executive assistant to the president, i.e., to Morgan, for

---

1. Second Amended Class Action and Derivative Complaint ("Compl.") at ¶ 1.

2. Compl. at ¶¶ 3, 11.

3. Compl. at ¶ 14.

4. Compl. Ex. 2 at 3.

5. Compl. at ¶ 11.

$10,000 per year plus health care benefits until age 65 or her earlier retirement, and to pay her a sum of $7,000 per month from her husband's death until she turned 65, and from the age of 65 until death, a sum which when added to her social security benefits equaled $7,000 per month.

A year later, in May 2003, Bruce Dickerson died. Pursuant to the plan of succession, Morgan assumed his current position as Chairman. Over the next several months, the Insider Majority gained control of the Randall Bearings board. By November 17, 2003, Wierwille had replaced Harris on the board,[6] and by the end of that month, Dickerson had resigned and the remaining board members had replaced her with defendant Richmond.[7]

Shortly after Bruce Dickerson's death, Morgan contacted Joseph P. Boeckman, the company's outside counsel from the firm of Baker & Hostetler LLP, seeking advice about how he and his subordinates Hager and Wierwille could secure a large equity stake in Randall Bearings. The dual purposes Morgan articulated for his desire for that stake were to provide himself and his key managers "an incentive to grow the company and increase shareholder value" and to "protect against a third party, other than [Susan Dickerson], gaining significant voting control over the company."[8]

On May 20, 2003, Boeckman sent Morgan a memorandum addressing these issues (the "May 20 Memo").[9] The May 20 Memo stated that in Boeckman's experience equity incentive plans typically ranged from 5% to 20% of the total outstanding shares. In light of that opinion, the May 20 Memo proposed a grant of 88,160 shares, or approximately 20% of the then-outstanding Randall shares, divided such that Morgan would receive 44,080 shares, Hager 33,060 shares, and Wierwille 11,020 shares. Additionally, the May 20 Memo recommended that Morgan enter into a voting trust agreement with Susan Dickerson "[b]ecause the equity award plan may not fully achieve [Morgan's] goals on voting control."[10] Such a voting trust would result in a voting bloc of 42.2% of the outstanding shares, which according to Boeckman would serve as "protection against an outside party . . . gaining, or influencing, voting control of [Randall Bearings]."[11]

Two days later, on May 22, 2003, Boeckman sent a second memorandum to Morgan on the same topic (the "May 22 Memo").[12] This memorandum did not include the concept of a voting trust, but it more than doubled the grant amounts suggested in the May 20 Memo. As such, the May 22 Memo was directed at the same purpose of "providing [the Insider Majority] with protection against a third party . . . gaining significant voting control over the company."[13] In total, the May 22 Memo recommended granting a total of 200,000 shares to Morgan, Hager and Wierwille, including 100,000 shares to Morgan, 75,000 shares to Hager, and 25,000 shares to Wierwille. This grant would equate to approximately 46% more shares than the company currently had outstand-

---

**6.** Compl. at ¶ 29.

**7.** Compl. at ¶ 34.

**8.** Compl. at ¶¶ 22, 25; *see also* Plaintiff's Answering Brief ("PAB") Ex. A at 1; PAB Ex. B at 1.

**9.** PAB Ex. A.

**10.** *Id.* at 2.

**11.** *Id.*

**12.** PAB Ex. B.

**13.** *Id.* at 1.

ing—more than twice the 20% high end of the range that Boeckman had previously indicated were typical for equity incentive plans. The May 22 Memo also recommended the creation of a Compensation Committee to approve the suggested equity awards and other executive compensation. Together, I refer to the May 20 and 22 memoranda drafted by Boeckman as the "Boeckman Memos."

By late September 2003, a dispute had arisen between Randall Bearings and Susan Dickerson regarding the provision of the benefits outlined in the May 2002 board resolutions. At the board meeting on September 23, 2003, Boeckman informed the board that Susan Dickerson was discussing a possible sale of her Randall Bearings stock. Because Dickerson's bloc was still the company's largest, the board feared that providing continuing and additional benefits to her might implicate the entire fairness standard of review by a court. Therefore, the board authorized Boeckman to pursue a settlement with Dickerson that would lessen the benefits she would receive from the company.

At its meeting on November 17, 2003, the board resolved to approve an equity incentive plan (the "Incentive Plan" as used previously) and a proposed amendment to the Randall Bearings certificate of incorporation (the "Charter Amendment" as used previously) in association with that Plan. The Charter Amendment reduced the par value of the company's stock, from $1.00 to $0.001 per share. The Incentive Plan authorized a maximum of 200,000 shares to be issued to "officers and other key employees of the Company . . . who . . . have responsibilities affecting management, development, or financial success of

the Company" at a price not less than par value by a committee of non-employee directors created by the board and having "sole," "final" and "binding" authority in administering these awards.[14] The Incentive Plan required that the shares granted under it be "subject to a vesting schedule based on the Participant's continued employment with the Company" and set the minimum vesting period at one year.[15] But, in the event of a change of control, as defined in the Incentive Plan, the restrictions on all shares granted under the Incentive Plan would lapse and all such shares would become fully vested.[16]

At the very same meeting that it approved the Charter Amendment and the Incentive Plan, the board also resolved to enter into a settlement agreement with Susan Dickerson. By that meeting, the board knew that Susan Dickerson was negotiating with A Cubed Corp. to sell her 29% interest in Randall Bearings. A Cubed was an affiliate of Roessing Bronze Co., a 6.8% shareholder of Randall Bearings.[17] The board was told that A Cubed had requested that Randall Bearings make certain representations as an inducement for A Cubed to complete its deal to buy Dickerson's bloc. To carry out this resolution, the board vested Morgan with discretion to approve any changes to the agreement.

That same week, on November 21, 2003, the company entered into a settlement agreement with Susan Dickerson (the "Settlement Agreement") and executed the agreement providing for the sale of Dickerson's stock to A Cubed (the "Stock Sale Agreement"). The Settlement Agreement terminated Dickerson's benefits under the

14. Compl. Ex. 1 at Ex. A §§ 2–3, 5.

15. *Id.* at § 6(c).

16. *Id.* at § 10.

17. *See* Compl. at ¶ 29; *see also* PAB Ex. A at C–1; PAB Ex. B at C–1.

May 2002 resolution and removed her as a director of Randall Bearings. In exchange, Dickerson received: a $10,000 annual payment; participation in the company's health plan for three years; a $19,000 annual payment until her 65th birthday; and the benefits of a surviving spouse under the Randall Bearings retirement plans.

In the Stock Sale Agreement, A Cubed purchased Dickerson's shares at a price of $8.00 per share.[18] As part of that Agreement, Randall Bearings, through Morgan, provided A Cubed with a series of representations and warranties. Of particular note is § 7.2 of the Stock Sale Agreement, which I refer to as the "Equity Capital Restriction." It states:

> **7.2 Issuance of Additional Shares.** As an inducement to Purchaser's entering into this Agreement, the Company covenants and agrees not to issue any shares of capital stock for a period of five years from the Closing Date without prior written consent of the Purchaser, except as follows:
>
> (a) The Company may issue up to 200,000 shares of [Randall Bearings] Common pursuant to the terms of the Management Stock Incentive Plan attached hereto as Schedule 7.2; and
>
> (b) The Company may issue any shares of [Randall Bearings] Common held by the Company as treasury shares, including shares of [Randall Bearings] Common acquired by the Company after the date of this Agreement and held as treasury shares, on such terms and subject to such conditions as may be approved by the Board of Directors of the Company.[19]

Following Susan Dickerson's resignation pursuant to the Settlement Agreement, the remaining directors—Morgan, Hager, Harrod, and Wierwille—resolved to replace her with defendant Stephen Richmond. For the remaining period relevant to this motion, the Randall Bearings board of directors consisted of these five individuals.

In April 2004, Randall Bearings issued its Proxy Statement (the "Proxy") in connection with an annual stockholder meeting to be held on May 25, 2004. At the annual meeting, the board sought to obtain stockholder endorsement of the Incentive Plan and the Charter Amendment that the board had approved in November 2003. Additionally, each of the five board members sought reelection.

The Proxy totaled only twelve pages, including a five page summary of the issues up for vote as well as the seven-page Incentive Plan in its entirety.[20] The purpose of the Incentive Plan as stated in the Proxy was to "advance the interests of the Company and its stockholders by providing a means of *attracting* and retaining *key employees* ... by granting equity-based awards ... which will be subject to vesting schedules based on the recipient's continued employment with the Company."[21] Likewise, the Plan itself stated that "[s]hares granted under this Plan shall be subject to a vesting schedule based on the Participant's continued employment with the Company" and that "[t]he minimum period for all of the Shares subject to any Award to become fully vested shall be one year after the date of grant."[22] Further, the Proxy disclosed that a committee consisting of one or more non-employee directors would ad-

---

18. Compl. at ¶ 31.

19. Compl. at ¶ 32.

20. *See* Compl. Ex. 1.

21. Compl. Ex. 1 at 4 (emphasis added).

22. Compl. Ex. 1 at Ex. A § 6(c).

minister the Incentive Plan and have the power to select recipients, grant shares, and set terms and conditions of the awards not inconsistent with the Incentive Plan.[23]

Neither the Proxy nor the Incentive Plan itself disclosed the contents of the Boeckman Memos or the existence of the Settlement Agreement, the Stock Sale Agreement, or even the Equity Capital Restriction contained in that Stock Sale Agreement, by which the board had agreed not to issue any additional equity for five years. Consistent with this non-disclosure, the Proxy was completely silent regarding the reason why the board had approved the Incentive Plan at precisely the same time as it was entering into a contract facilitating the sale of the company's largest bloc of stock.

The Randall Bearing stockholders voted to approve the Charter Amendment and the Incentive Plan, albeit not by a large margin of the eligible votes. Of the 431,680 shares eligible to vote, 250,406 cast ballots.[24] Of those voting, between 250,254 and 250,406 shares voted to reelect each director, 238,102 shares voted to approve the Incentive Plan and 234,606 shares voted to approve the Charter Amendment.[25] In other words, the Incentive Plan passed with a 55% majority while the Charter Amendment carried with 54% support.

Within two hours of the May 25, 2004 annual meeting, the board formed a "Compensation Committee" consisting of directors Harrod and Richmond to administer the recently approved Incentive Plan.

On that same day, the Compensation Committee had its first meeting, lasting 25 minutes, at which Boeckman presented a proposal to grant all 200,000 shares approved in the Incentive Plan to the Insider Majority—i.e., defendants Morgan, Hager and Wierwille—in the same proportions and on the same terms as outlined in the May 22 Memo.[26] Boeckman was the sole source of outside advice to the Compensation Committee.

In its next meeting, which was a 20 minute telephone call on June 3, 2004, the Compensation Committee approved the grants to the Insider Majority and a form of "Restricted Stock Agreement" to be used to effect the issuance of the shares. Except for a small change, this approved plan was the same as the one presented by Boeckman on May 25, 2004 and outlined in his May 22 Memo.[27] Notably, no discussion of the fair value of the Randall Bearings stock to be granted occurred at this meeting. Again, Boeckman was the only source of advice to the Compensation Committee. By July 1, 2004, the Insider Majority had accepted their stock awards and entered into Restricted Stock Agreements in the form approved by the Compensation Committee.

The Restricted Stock Agreements, executed by the Insider Majority members, provided that the 200,000 shares authorized in the Incentive Plan would be issued at the newly amended par value of a tenth of a penny per share. The shares would vest in each upon a pre-set schedule of 5% of the shares on each of the first through

---

23. Compl. Ex. 1 at 4.

24. Compl. at ¶ 46.

25. *Id.*

26. *See* Compl. at ¶ 47; *see also* PAB Ex. D.

27. The original vesting schedule in the Boeckman Memos provided for no vesting until the sixth anniversary of the grant, whereas the vesting schedule proposed by Boeckman at this meeting and ultimately adopted provided for 5% vesting during years one through four and 8% thereafter. *Compare* PAB Ex. A at B–1; PAB Ex. B at B–1 *with* Defendant's Opening Brief ("DOB") Ex. E at Ex. A; DOB Ex. F at Ex. A § 2.

fourth anniversaries of the grant and 8% on each successive anniversary such that 100% of the shares would be vested on the 14th anniversary of the grant.[28] If the executive's employment with the company terminated for any reason before the 14th anniversary, any unvested shares would be forfeited.[29] During this vesting period, no legal interest, vested or unvested, in the shares could be sold, assigned, pledged or otherwise transferred.[30] Yet, the executive was immediately entitled to all other rights of stockholders, including the right to vote and the right to receive dividends on the full grant amount.[31] In the event of a change in control, all of the shares would immediately vest, thereby ensuring the Insider Majority approximately nearly a third of the value of any sale of the company.[32]

On June 28, 2004 and July 23, 2004, the Compensation Committee held two further meetings that addressed the tax implications of these grants. Again, Boeckman was the only source of advice. At the first meeting which lasted approximately 30 minutes, Boeckman reported that Morgan, Hager and Wierwille were considering an election under Section 83(b) of the Internal Revenue Code[33] to treat the stock awards as taxable compensation as of the grant date. Boeckman advised the Committee that it was typical for companies to pay the taxes for executives who made such an election.

The possibility that Randall Bearings would pay the taxes for any executives receiving stock under the Incentive Plan was not disclosed in the Proxy sent to the stockholders. But it was not a new issue for the Insider Majority or Boeckman. In his May 20 and May 22 Memos, Boeckman had explained the tax options available to the Insider Majority upon receiving stock grants as follows:

- No Tax Consequences on date of grant.
- When restrictions applicable to the shares lapse, the executive will be treated as receiving taxable compensation in an amount equal to the value of the vested shares on the date of vesting, and [Randall Bearings] will be entitled to a deduction, as compensation paid, in an amount equal to the taxable compensation of the executive.
- In the alternative, the executive could make an election to treat some or all of the shares as taxable compensation on the date of the grant, and the executive would pay taxes on the value of such shares on the date of grant. The benefit to the executive is that he pays less in taxes if the value of the shares appreciates over time, with the risk that he may forfeit some or all of the shares on which he has paid taxes.[34]

It is readily inferable at this stage that Boeckman was providing the Insider Majority with advice about their tax options throughout the process leading to their receipt of all of the 200,000 shares issued under the Incentive Plan.

When the Compensation Committee was brought into the golden circle in June 2004, it considered Boeckman's proposal that bonuses be paid to the Insider Majori-

**28.** DOB Ex. F. at Ex. A § 2.

**29.** *Id.* at § 3.

**30.** *Id.* at § 4.

**31.** *Id.* at § 5.

**32.** *See* DOB Ex. F at Ex. A § 2; Compl. Ex. 1 at Ex. A § 10.

**33.** 26 U.S.C. § 83(b) (2006).

**34.** PAB Ex. B at B–1; *see also* PAB Ex. A at B–1.

ty to cover the tax liability they would incur as a result of making the § 83(b) election. In that discussion, the Compensation Committee considered the fair market value of the 200,000 shares for the first time as that value would affect the amount of the tax and thus the bonuses to be paid. Boeckman continued to act as the committee's only source of advice.

On July 23, 2004, the valuation issue was considered in more detail, and the Committee resolved to pay special bonuses to the Insider Majority to cover their tax obligations triggered by the stock grants and their subsequent § 83(b) elections (the "Tax Bonuses"). During that 90 minute discussion, three alternatives for fair value were considered: first, a price of $5.25 per share based on the prior day's closing price; second, a price of $5.60 per share computed by diluting the Stock Sale Agreement's $8.00 per share price by the additional 200,000 shares; and third, a value of $7.85 per share reflecting the book value of the company ($11.21 per share) after dilution.[35] No EBITDA analysis or multiple was calculated because Randall Bearings had operated at a loss in 2002 and 2003 rendering that analysis impossible. Following the discussion, the Compensation Committee, without any outside advice from anyone other than Boeckman, concluded that the fair market value per share was $5.60.[36]

In order to pay the Tax Bonuses, Randall Bearings was forced to incur debt costing the company $759,507, including the amount borrowed and the interest accrued over its five-year maturity.[37] The payment of these Bonuses contributed to the company losing over $1 million in 2004.[38] In fact, in the Randall Bearings 2005 annual report, Morgan admitted that "excluding the impact of the restricted stock award and the related one-time tax bonuses ... the company would have generated an operating profit of $332,235 in 2004."[39] This stands in contrast to the actual 2004 operating loss of over $1.7 million that Randall Bearings reported in 2004.[40]

In his complaint, plaintiff Sample alleges that the Compensation Committee was not properly informed when it approved these grants. The minutes contain no evidence of deliberation before the Committee's approval regarding the amounts of the grants, the value of the grants, the terms (including price) of the grants, appropriate ranges for equity incentive awards, performance targets, or the fairness of the grants to public stockholders. Thus, Sample asserts that "[i]nstead of duly considering strategies to maximize stockholder value ... [the board adopted] a self-dealing plan to entrench the Company under the then-current management and massively dilute the equity interests of the public holders to benefit management personally."[41]

## III. *Procedural Posture*

After the grants to the Insider Majority were disclosed, plaintiff Sample filed a books and records action to obtain certain documents. After reviewing those documents, Sample served his original complaint on March 28, 2005 and his First Request for Documents on April 11, 2005. The complaint named as defendants the

---

**35.** Compl. at ¶ 50.

**36.** *Id.*

**37.** Compl. at ¶ 57.

**38.** *Id.*

**39.** Compl. Ex. 2 at 3.

**40.** *Id.*

**41.** Compl. at ¶ 55.

directors who comprised the Randall Bearings board during the time between December 2003, when Susan Dickerson was replaced on the company's board, and July 2004, when the grants to the Insider Majority were approved.

Sample sought leave and filed an amended complaint on May 20, 2005. The defendant directors moved to dismiss the action under Court of Chancery Rule 12(b)(6) on June 9, 2005, by way of a bare motion without a supporting brief or argument. Their motion to stay written discovery was denied and documentary discovery was completed. During that process, the defendants sought to conceal the Boeckman Memos, first by claiming that they were privileged, and later, after that objection was overruled, by redacting key portions of the Memos referring to the Insider Majority's entrenchment motives on the ground that those portions were irrelevant. Those redactions were ruled improper and a motion to compel was granted.[42]

After that, Sample filed a second amended complaint on May 5, 2006. Inertial impulses, rather than reasoned reflection, impelled the defendant-directors forward, and they again moved to dismiss pursuant to Rule 12(b)(6) on June 2, 2006.

### IV. *Sample's Claims And The Directors' Responses*

There are several counts in the operative complaint, many of which are redundant.

Counts I, II, and III of the complaint assert that the defendant-directors breached their fiduciary duties and wasted corporate resources when they approved and implemented an Incentive Plan whereby the Insider Majority received immediate voting and dividend rights in 200,000 shares of Randall Bearing stock with a fair market value of at least $2.3 million for only $200 and were paid Tax Bonuses totaling over $683,000 to pay their personal tax obligations resulting from that grant. Count I presents these claims as a direct claim eligible for class action treatment because the grants injured the voting rights of the Randall Bearing public stockholders. Count II asserts a derivative claim on behalf of Randall Bearings on the ground that the share issuance to the Insider Majority was unfair and resulted from self-dealing by the Insider Majority. Count III is a derivative claim for waste.

Count IV addresses the related issue of how the Charter Amendment and the Incentive Plan came to be approved by the Randall Bearing stockholders. That Count alleges that the failure of the directors to disclose the contents of the Boeckman Memos and the existence of the Equity Capital Restriction, among other things, rendered the Proxy materially misleading.

Taken together Counts I through IV are in essence one claim for breach of fiduciary duty. They find their basis in the proposition that the Charter Amendment and the Incentive Plan resulted from a conscious scheme of entrenchment and personal self-enrichment by the Insider Majority, facilitated by the advice of Boeckman, which was purposely concealed from the Randall Bearing stockholders when they were asked to vote on the Amendment and the Plan. At best, the two putatively independent directors of Randall Bearings were unwitting and uninformed accomplices in this pre-conceived plan who, rapidly and without due consideration, implemented the scheme by granting the Insider Major-

**42.** Transcript of Telephone Conference on Disputed Document Redactions and Ruling of the Court (Apr. 21, 2006) at 3–4 (requiring production of unredacted documents); *see also* Transcript of Oral Argument (Mar. 13, 2006) at 39–42 (ruling on privilege issue).

ity nearly a third of the future voting and dividend rights in the company for a total of $200 and without having to pay their own taxes. By these actions, the directors allegedly ensured that the company would suffer net losses in 2004, that the stockholders would suffer a reduction in the book value of their shares of $2.45 apiece, and that the Insider Majority would wield sufficient voting power to be insulated from any outside challenge.

Count V addresses a distinct action by the defendants. Count V alleges that the directors abdicated their statutory role under 8 *Del. C.* § 141 by conveying to A Cubed, a stockholder, veto rights over all stock issuances, except the 200,000 shares earmarked for the Incentive Plan, for a period of five years. Plaintiff Sample claims that stock issuances "lie[ ] at the heart of the Board's governance authority under 8 *Del. C.* § 141(a)" [43] and that the contractual provision limiting the board's right to make additional grants of equity "constitutes an invalid and unenforceable abdication of fundamental board authority." [44] Less stark is the alternative allegation also contained in Count V that Randall Bearings as a corporation received no consideration from A Cubed in exchange for the restriction.

The directors have moved to dismiss all of the Counts under Rule 12(b)(6). [45] The directors claim that Counts I–IV addressing the Charter Amendment and the Incentive Plan are barred by the doctrine of ratification because the Randall Bearings stockholders approved them with full knowledge that their terms could have resulted in exactly the conduct that ensued. According to the directors, the failure to disclose the substance of the Boeckman

Memos, the Dickerson Settlement, the Stock Sale Agreement, and the Equity Capital Restriction did not render the Proxy materially misleading. Alternatively, the directors argue that the facts pled in the complaint exemplify informed approval by independent directors and therefore do not, even at the pleading stage, raise an inference of breach of fiduciary duty, much less a claim for waste.

As to Count V challenging the Equity Capital Restriction, the directors argue that the complaint fails to plead facts suggesting that the board's decision to approve the Equity Capital Restriction was a breach of fiduciary duty. Because the Equity Capital Restriction enabled the company to reduce some of its pre-existing obligations to Susan Dickerson (by facilitating her sale to A Cubed, which lightened her demands), the directors contend that there was a business purpose for granting the Restriction. Furthermore, the directors claim that directors of a Delaware corporation may, as a matter of legal power, enter into a contract restricting their right to issue additional equity for a period of years. Therefore, they argue that Count V fails to state a claim.

Alternatively, they argue that Count V must be dismissed because this court cannot invalidate the Equity Capital Restriction of the Stock Sale Agreement in a proceeding in which Susan Dickerson and A Cubed—the primary parties to that Agreement—are not present. Because the Restriction was fundamental to the economics of A Cubed's purchase of Dickerson's bloc for $8.00 per share, the defendants say that this court could not set that Restriction aside in A Cubed's absence.

---

**43.** Compl. at ¶ 84.

**44.** *Id.*

**45.** Given the presence of an insider majority on the Randall Bearings board, the defendant-directors have not moved for dismissal under Rule 23.1.

## V. *The Procedural Standard*

The standard of review that applies to a motion to dismiss pursuant to Court of Chancery Rule 12(b)(6) is well established. The motion will be granted if "it appears with reasonable certainty that, under any set of facts that could be proven to support the claims asserted, the plaintiff[ ] would not be entitled to relief." [46] In considering a motion to dismiss under Rule 12(b)(6), the court is required to assume the truthfulness of all well-pled allegations of fact in the complaint and may consider the unambiguous terms of documents incorporated by reference in the complaint when the documents are integral to the plaintiff's claims.[47] The court should not accept as true conclusory statements unsupported by fact nor should it draw unreasonable inferences in favor of plaintiffs,[48] but the plaintiff is entitled to all reasonable inferences that logically flow from the face of the complaint.[49] Thus, "under Delaware's judicial system of notice pleading ... the plaintiff need only allege facts that, if true, state a claim upon which relief can be granted." [50]

## VI. *Legal Analysis*

I address the defendant-directors' motion to dismiss the complaint in two logical chunks. Initially, I address their attack on those counts of the complaint regarding the defendants' actions in connection with the Charter Amendment and the Incentive Plan. Then, I conclude by considering their challenge to the count regarding the directors' decision to enter into the Stock Sale Agreement containing the Equity Capital Restriction.

### A. *Sample's Counts Relating To The Charter Amendment And The Incentive Plan State A Claim*

In essence, Counts I through IV contend that the directors of Randall Bearings breached their fiduciary duties by adopting, procuring stockholder approval of, and implementing the Charter Amendment and Incentive Plan. According to the complaint, the Incentive Plan was conceived of by the Insider Majority and its counsel Boeckman as a method of securing their control over the company and enriching themselves. Instead of fairly disclosing relevant facts, including the contents of the Boeckman Memos, the Stock Purchase Agreement, and the Equity Capital Restriction, to the stockholders when seeking their approval of the Amendment and the Plan, the directors led the stockholders to believe that the Plan was needed in order to "attract[ ] and retain[ ] key employees." [51] Immediately after the stockholders approved the Amendment and the Plan, the Compensation Committee awarded all the stock it could issue to the Insider Majority consistent with the Insider Majority's prior planning with Boeckman.

In doing so, the Compensation Committee spent relatively little time deliberating and relied entirely upon Boeckman for advice. The Committee required the Insider Majority to pay only a tenth of a penny per share, even though it later found the book value of company shares to be $5.60

**46.** *VLIW Tech., LLC v. Hewlett–Packard Co.,* 840 A.2d 606, 610–11 (Del.2003).

**47.** *E.g., Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.,* 906 A.2d 168, 188 & n. 55 (Del.Ch.2006).

**48.** *E.g., Grobow v. Perot,* 539 A.2d 180, 187 n. 6 (Del.1988).

**49.** *E.g., Malpiede v. Townson,* 780 A.2d 1075, 1082 (Del.2001).

**50.** *VLIW,* 840 A.2d at 611.

**51.** Compl. Ex. 1 at 4 (describing the Incentive Plan) & Ex. A § 1 (stating the "Purpose of Plan").

each when calculating the Tax Bonuses and it already knew that A Cubed had paid Dickerson $8.00 per share in November 2003. Although the shares vested over time, the Insider Majority immediately received nearly a third of the company's voting power and dividend rights. And, in the event of any change in control, the full slug vested, giving the Insider Majority nearly a third of the proceeds of any sale transaction, and an argument for receiving a control premium. Further, the Compensation Committee decided that the Insider Majority should not have to pay their own taxes, causing the company to go into debt in order to cover that burden for them. Plaintiff Sample argues that this course of events, at the very least, creates a pleading-stage inference of breach of fiduciary duty.

He is correct and the directors' contrary arguments are flimsy.

■ In briefly explaining why, I begin with the question of disclosure. This disclosure question arises in two related forms. In Counts I and II, Sample has argued that the directors breached their fiduciary duties by failing to disclose material facts when asking the stockholders to approve the Charter Amendment and the Incentive Plan. By way of a defense to all of the claims in the complaint related to the Amendment and the Incentive Plan, the directors argue that the stockholders' fully-informed approval constitutes ratification and extinguishes any claim for breach of fiduciary duty against them.

The disclosure issues here are not complex. The directors' ratification argument has no logical force. Their point is simple: the Proxy disclosed that the Amendment was authorizing a reduction in the par value of the company's shares from a dollar to a fraction of a cent and disclosed the exact terms of the Incentive Plan. These were, in the directors' view, the only material facts necessary to be disclosed. Moreover, under the literal terms of the Amendment and Plan, as disclosed to the stockholders, it was possible for the Compensation Committee to award all of the 200,000 shares immediately to the Insider Majority at a tenth of a penny apiece. Knowing that was a possibility, the Randall Bearing stockholders must be deemed to have ratified any future action of the board of that kind. That is, by approving the Charter Amendment and the Incentive Plan, the Randall Bearing stockholders were, the directors contend, ratifying any future action by the board, however motivated or informed, so long as that action was compliant with the literal terms of the Amendment and the Plan.

■ That argument is wrong for two independent reasons. The first is that the Delaware doctrine of ratification does not embrace a "blank check" theory. When uncoerced, fully informed, and disinterested stockholders approve a specific corporate action, the doctrine of ratification, in most situations,[52] precludes claims for breach of fiduciary duty attacking that action.[53] But the mere approval by stock-

---

**52.** The anomaly of controlling stockholder mergers is an exception. *See Kahn v. Lynch Communication Systems, Inc.,* 638 A.2d 1110 (Del.1994); *see also In re Pure Resources,* 808 A.2d 421 (Del.Ch.2002) (discussing the evolution of this doctrine); *In re Cox Communications S'holders Litig.,* 879 A.2d 604 (Del.Ch. 2005) (same).

**53.** *E.g., In re PNB Holding Co. S'holders Litig.,* 2006 WL 2403999, at *14 (Del.Ch.2006) ("[O]utside the *Lynch* context, proof that an informed, non-coerced majority of the disinterested stockholders approved an interested transaction has the effect of invoking business judgment rule protection for the transaction and, as a practical matter, insulating the transaction from revocation and its proponents from liability."); *Solomon v. Armstrong,*

holders of a request by directors for the authority to take action within broad parameters does not insulate all future action by the directors within those parameters from attack. Although the fact of stockholder approval might have some bearing on consideration of a fiduciary duty claim in that context, it does not, by itself, preclude such a claim. An essential aspect of our form of corporate law is the balance between law (in the form of statute and contract, including the contracts governing the internal affairs of corporations, such as charters and bylaws) and equity (in the form of concepts of fiduciary duty). Stockholders can entrust directors with broad legal authority precisely because they know that that authority must be exercised consistently with equitable principles of fiduciary duty.[54] Therefore, the entrust-

ment to the Randall Bearings Compensation Committee of the authority to issue up to 200,000 shares to key employees under discretionary terms and conditions cannot reasonably be interpreted as a license for the Committee and other directors making proposals to it to do whatever they wished, unconstrained by equity. Rather, it is best understood as a decision by the stockholders to give the directors broad legal authority and to rely upon the policing of equity to ensure that that authority would be utilized properly. For this reason alone, the directors' ratification argument fails.

The second reason that the directors' ratification argument fails is that they have failed to demonstrate that they disclosed all the material facts[55] relevant to

---

747 A.2d 1098, 1117 (Del.Ch.1999) ("Absent any other allegations that might cast doubt on the board's disinterest vis-à-vis the merits of the transaction, an informed and uncoerced shareholder vote on the matter provides an independent reason to maintain business judgment protection for the board's acts."), aff'd, 746 A.2d 277 (Del.2000); see also 8 Del. C. § 144(a)(2) (explaining that no contract or transaction between a corporation and one or more of its directors shall be voidable if the "material facts as to the director's ... relationship or interest and as to the contract or transaction are disclosed or are known to the shareholders entitled to vote thereon, and the contract or transaction is specifically approved in good faith by vote of the shareholders."); Solomon, 747 A.2d at 1115 & n. 49 (applying § 144).

54. That the operation of Delaware corporate law depends importantly on the subjection of action in conformity with legal rules to equitable principles has long been understood. In an historically-important article, Adolphe Berle captured thusly the two fundamental inquiries that determine the propriety of any corporate action:

[I]n every case, corporate action must be twice tested: first, by the technical rules having to do with the existence and proper exercise of the power; second, by equitable rules somewhat analogous to those which

apply in favor of a cestui que truest to the trustee's exercise of wide powers granted to him in the instrument making him a fiduciary.

Adolphe A. Berle, Corporate Powers As Powers In Trust, 44 HARV. L.REV. 1049, 1049 (1931). In support of the assertion that legally-permitted action could still be proscribed as inequitable, Berle cited Bodell v. General Gas & Elec. Corp., 132 A. 442 (Del.Ch.1926), as supporting that "general thesis." Id. at 1060. And, of course, Schnell v. Chris–Craft, 285 A.2d 437 (Del.1971), made clear that the comprehensive revision of the Delaware General Corporation Law in 1967 did not change this long-standing feature of our law's operation. Id. at 439 ("[I]nequitable action does not become permissible simply because it is legally possible."); see also Leo E. Strine, Jr., If Corporate Action Is Lawful, Presumably There Are Circumstances In Which It Is Equitable To Take That Action: The Implicit Corollary To The Rule Of Schnell v. Chris–Craft, 60 BUS. LAW. 877, 881–83 (2005). By reaffirming this principle, our Supreme Court made clear that directors exercising the broad powers granted to directors by the DGCL would continue to be policed by equity.

55. The definition of materiality I apply is well settled. In order for an omitted fact to be material, "there must be a substantial likeli-

the stockholders' consideration of the Charter Amendment and the Incentive Plan. As to this issue, the directors' ratification defense and the complaint's disclosure count intersect. One way that a defendant may obtain dismissal of a breach of fiduciary duty claim is by demonstrating that, even after giving the plaintiff all reasonable pleading-stage inferences, the complaint does not plead facts supporting an inference that the directors failed to disclose a material fact or otherwise misled the stockholders.[56]

In other words, in order for directors to access the safe harbor of ratification, they must meet an affirmative "burden of demonstrating full and fair disclosure."[57] One way of meeting that burden is to take on the onerous task of showing that a plaintiff's claim of a disclosure violation cannot withstand challenge in the plaintiff-friendly environment of a Rule 12(b)(6) motion.

As applied here, these principles mean that the complaint stands, and the directors' ratification defense fails, if I find that the complaint pleads that the disclosures in the Proxy seeking approval of the Charter Amendment and the Incentive Plan were materially misleading. If a material fact relevant to the voting decision was not disclosed, the complaint must be sustained.[58] Similarly, if I conclude that the directors did not provide a "a full and fair explanation of the rationale for [the] proposal[s] that [the] directors [were] recommending stockholders to approve," I must deny the motion to dismiss.[59] These results find resonance in the partial disclosure doctrine, which rests in the notion that "once [directors] traveled down the road of partial disclosure . . . an obligation to provide the stockholders with an accurate, full, and fair characterization" attaches.[60]

Here, there is no need to belabor the obvious. The complaint pleads the directors' failure to disclose facts that would have been material to a reasonable investor voting on the Charter Amendment and the Incentive Plan. The reasonable inference one draws from the Boeckman Memos is that the Amendment and the Plan had their origins in a desire by the Insider Majority, facilitated by Boeckman's advice, to obtain for themselves a large bloc of stock at a cheap price that would provide them both with the ability to keep control over Randall Bearings and a major share

---

hood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944 (Del.1985) (quoting *TSC Indus. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)).

56. *E.g., Harbor Finance Partners v. Huizenga*, 751 A.2d 879, 881 (Del.Ch.1999) (dismissing disclosure claims and finding that ratification precluded breach of loyalty claims under Rule 12(b)(6)); *Solomon*, 747 A.2d at 1129 (concluding "that the disclosures appraised the shareholders of all material information, and nothing indicates to me that any disclosure was intended to, or actually did, wrongfully coerce shareholder ratification" and therefore dismissing plaintiff's complaint).

57. *Loudon v. Archer–Daniels–Midland Co.*, 700 A.2d 135, 140–41 (Del.1997). Phrased another way, there is "a general duty of directors to disclose to stockholders all material information reasonably available when seeking shareholder action." *Id.* at 137.

58. *Stroud v. Grace*, 606 A.2d 75, 84 n. 1 (Del.1992) (emphasis omitted).

59. *ODS Technologies, L.P. v. Marshall*, 832 A.2d 1254, 1261 (Del.Ch.2003).

60. *Arnold v. Society for Savings Bancorp, Inc.*, 650 A.2d 1270, 1280 (Del.1994); *see also In re MONY Group S'holder Litig.*, 852 A.2d 9, 24–25 (Del.Ch.2004) ("[O]nce [directors] take it upon themselves to disclose information, that information must not be misleading.").

of its cash flow and capital appreciation. This inference is strengthened by another fact that the Proxy failed to disclose, which was Boeckman's advice that an issuance of 5% to 20% of the outstanding equity—less than half of the 46% of the outstanding equity that the ultimate Incentive Plan contemplated—would be the typical range of most corporate equity incentive plans. The Memos themselves suggest that the reason the Plan was sized at more than twice what Boeckman himself considered the high range of corporate equity plans was to ensure that the Insider Majority achieved their control objectives.

Critically, the Boeckman Memos also contain an allocation plan that suggests that it was contemplated from the get-go that all of the shares authorized by the stockholders would be granted to the Insider Majority. That the Amendment and Plan had their origin in this type of planning would clearly be of relevance to a reasonable investor. Also, at a pleading stage, the failure to disclose the Settlement Agreement, the Stock Sale Agreement, and the Equity Capital Restriction lends support to the inference that material facts were not disclosed. Likewise, the Dickerson family's interest in divesting itself of the company's largest bloc of stock seems, at this point, to be more than felicitously coincidental with the Insider Majority's conception of the Incentive Plan. In fact, the May 20 Memo points to a more advertent relation by contemplating a voting trust arrangement to bolster the Insider Majority's ability to repel a hostile threat, as does the board's simultaneous approval on November 1, 2003 of the Settlement Agreement, the Stock Sale Agreement, the Charter Amendment, and the Incentive Plan. Most vitally, the Proxy failed to disclose that the company had assented to the Equity Capital Restriction and that by voting to approve the Charter Amendment and the Incentive Plan, the stockholders were authorizing stock grants to key employees of the only equity capital the company could issue during the next five years. Although it is arguable that whatever harm done by the Equity Capital Restriction was already extant, a reasonable stockholder would still have found the Restriction material in determining whether to vote for the Amendment and the Plan.[61]

These omitted facts are even more important when one considers that the stockholders were told that the purpose of the Incentive Plan was to enable the company to "attract[ ] and retain[ ] key employees." [62] A reasonable inference is that the Insider Majority's plan from the beginning was to secure all 200,000 shares for themselves. In that case, just who was the company seeking to "attract"? More important, an inference arises that the Proxy was drafted by Boeckman with input from the Insider Majority—this being the normal order of how such disclosure documents are drafted—and that the use of the word "attract," which could apply to candidates the company would hire over time, and the broader term "key employees," which could apply to a larger uni-

---

61. By this, I mean that the Equity Capital Restriction does not by its own terms permit the board to issue 200,000 shares for a purpose other than funding grants under the Incentive Plan. But it would certainly make it easier for the company to get approval from A Cubed for a grant if A Cubed faced no dilution from the Incentive Plan. As important, a reasonable stockholder might find it relevant in her deliberations concerning whether to give the powers contemplated by the Incentive Plan to the same board that had entered into the Equity Capital Restriction so as to facilitate the sale of a control bloc. That is especially so when that fact is considered in context with the Boeckman Memos.

62. Compl. Ex. 1 at 4.

verse of existing employees,[63] was deliberately designed to suggest that grants would be made over time to a more diffuse group of employees. Given the discrepancy between the objectives for the Plan articulated in the Boeckman Memos and the "Description of Incentive Plan" [64] that the directors provided to the stockholders in the Proxy, I cannot rule out that the summary might later be found to have been intentionally drafted in a manner that would encourage stockholder approval on an erroneous factual premise. Certainly, it would have been more informative to include in the summary the following:

> Under the terms of the Incentive Plan, the committee to be appointed could grant all 200,000 shares to the three employees of the company on the board consistent with a pre-existing plan to this effect designed by company counsel. Copies of memoranda explaining that plan are attached as exhibits X and Y. Under the terms of the Incentive Plan, all 200,000 shares could be granted immediately to these three employees for a tenth of a penny per share. These employees could end up immediately with nearly a third of the company's voting power and a concomitant claim to dividends even if the shares were subjected to a vesting period. In the event of a change in control, all shares so granted would vest and the three employees would reap nearly a third of any value obtained in a sale of the company. Once a grant of that kind was made, the company would be unable, per the terms of the Equity Capital Restriction, which has been earlier described, to issue any other stock for five years. Thus, if the company wished to attract or retain other key employees, it could not use its stock as an inducement.

In view of the existence of the Boeckman Memos and the Equity Capital Restriction, the summary of material terms contained in the Proxy emerges at this stage as materially misleading.[65] I leave for another day whether there are other reasons why the summary might considered to be materially misleading because, in Sample's estimation, it intentionally highlighted protective features of the Plan (such as vesting and transfer restrictions and the involvement of an independent committee in determining to whom and on what terms grants would be made) while failing to highlight other features (such as the fact that all grants would vest upon a change of control).[66]

---

63. The directors argue that because Randall Bearings was a small company, the stockholders would have known that only the Insider Majority was likely to be granted shares. DOB at 21–22 (citing Randall Bearings, Inc., http://www.RandallBearings.com/contact_us.htm (last visited Jan. 19, 2007)). But the company's website, which the directors cite, lists the "management" eligible to receive shares under the "management Incentive Plan," names over 15 employees *other than* the Insider Majority, several of whom hold titles such as "Plant Manager" and "Senior Manufacturing Manager." *See id.* (providing names, titles, and contact information for the company's employees).

64. Compl. Ex. 1 at 4–5 (purporting to contain "a summary of the material provisions of the Incentive Plan").

65. The Plan, as approved, also purported to absolve directors of liability for action under the Plan in a fashion beyond that permitted by 8 *Del. C.* § 102(b)(7). *See* Compl. at ¶ 45 & Ex. 1 at Ex. A § 17 (purporting to limit liability for board or committee actions with respect to the Incentive Plan as long as "made or taken in good faith"). Furthermore, the Plan was not a certificate amendment as contemplated by 8 *Del. C.* § 102(b)(7) and it appears that the Randall Bearings certificate of incorporation lacks an exculpatory charter provision. Compl. at ¶ 2(e).

66. Most of the other reasons the plaintiffs suggest that the summary is misleading relate

Having concluded that the complaint pleads facts supporting an inference that the Proxy was materially misleading and that the directors' ratification defense is without force at this stage, I will not dilate at any great length on the directors' other arguments for dismissal. Put simply, that the complaint does not plead facts suggesting that Harrod and Richmond, the two members of the Compensation Committee, were beholden to the Insider Majority, is not sufficient unto itself, as the directors believe, to buttress a dismissal order.

■ For present purposes, the complaint supports an inference that the Compensation Committee was, at the very least, laboring under a misapprehension about the purposes behind the Incentive Plan. Their sole advisor, attorney Boeckman, was the same advisor who conceived of the Incentive Plan in order to achieve the Insider Majority's goal of securing a bloc of shares that would deter any outsider from gaining control. At this stage, Sample does not know whether Boeckman shared the motives of the Insider Majority with the Compensation Committee. There is no evidence that his earlier Memos were provided to the Committee. In this procedural posture, it does not matter.

To the extent that Boeckman shared his prior planning with the Insider Majority with the Committee and the Committee then proceeded to implement those plans, that course of conduct would raise serious questions about the Committee's compliance with its duty of loyalty. In view of the contents of the Memos and their nondisclosure to the stockholders in the Proxy, a pleading-stage inference that the Committee consciously preferred the personal interests of the Insider Majority over the interests of the corporation arises in that scenario. That inference finds justification in the extraordinary nature of the grants, which gave the Insider Majority nearly a third of the voting control of, and the cash flow rights from, the company for a tenth of a penny per share.

On the other hand, if the Compensation Committee, using Boeckman as its sole advisor, conferred such an extraordinary grant in ignorance of the prior planning between Boeckman and the Insider Majority, that lack of knowledge provides no basis to dismiss the complaint. Rather, it suggests that there may have been fraud on the Committee by Boeckman (and implicitly, by the Insider Majority), who failed to disclose to the Committee the material facts inspiring the Incentive Plan. Furthermore, given the brevity of the Committee's deliberations and its sole reli-

to the fundamental failure of the Proxy to forthrightly disclose the origins of the Incentive Plan—as described in the Boeckman Memos—and the relationship of the Plan to the contracts with Susan Dickerson and A Cubed. In view of those non-disclosures, the plaintiffs' arguments that the failure of the Proxy to disclose facts regarding the value of the company's shares or to include a description of the change in control provisions of the Incentive Plan in the summary rendered the Proxy materially misleading take on more force and are better addressed in the full context of a trial. In such a trial, the court can assess how the summary came to be drafted, in light of the state of mind of those involved.

In taking that approach, I do not embrace the idea that it was of no protective value for the directors to have disclosed the entire text of the Charter Amendment and the Incentive Plan. Investors should be deemed responsible, intelligent readers with a duty to read that which is provided to them. *See Cinerama, Inc. v. Technicolor, Inc.,* 1991 WL 111134, at *25 (Del.Ch.1991) (holding that "[j]ust because certain information is contained in exhibits does not mean that that information is not adequately disclosed" and that "[d]isclosure documents must be read as a whole," but also noting that the use of exhibits was not a "license to bury important information in an attempt to make it less accessible to shareholders") (subsequent history omitted).

ance on Boeckman for advice, a serious issue arises about the Committee's compliance with its duty of care. The Committee's generosity, if it could be called that, might be thought to have arisen as much from the rapid action of a poorly-informed committee relying upon conflicted advice from a lawyer subservient to management rather than from a good faith exercise of business judgment.[67] By way of example, there is no indication that the Committee gave any thought to allocating any of the 200,000 shares to any employees other than the Insider Majority or to retaining shares in order to, in the words of the Proxy, "attract" new employees in the future. Rather, the Committee in a series of quick meetings beginning the very day of the stockholder vote quickly focused on granting all 200,000 shares to the Insider Majority.

Of course, in the end, the differences between the personal interests of the Insider Majority and the members of the Compensation Committee may be critical. Each director's motivations and actions must be assessed individually before any

finding of liability can be made.[68] But, on this motion, the Compensation Committee directors have not tried to distinguish themselves from the Insider Majority and do not rely upon an exculpatory charter provision. Indeed, they share the same counsel and have filed one brief taking the un-nuanced position that everything that was done was just ducky.[69]

█ In this respect, I also decline the directors' invitation for me to conclude that the grants to the Insider Majority could not constitute waste. Although the test for waste is stringent, I believe that Sample has pled facts supporting a pleading-stage inference of waste. Claims of waste are sometimes misunderstood as being founded on something other than a breach of fiduciary duty.[70] Conceived more realistically, the doctrine of waste is a residual protection for stockholders that polices the outer boundaries of the broad field of discretion afforded directors by the business judgment rule.[71] The wording of the test implies as much, as it condemns as wasteful a transaction that is

---

**67.** I note here that if combined, Morgan, Hager, Wierwille and A Cubed held over 52% of the voting stock of Randall Bearings. Abstracting figures from the addendum to the May 22 Memo reveals that after the transactions closed, Morgan was expected to have 111,647 shares, Hager 75,000 shares, Wierwille 25,000 shares, and A Cubed, Dickerson's 123,345 shares, while only 640,827 shares were expected to be outstanding. This *de jure* control is not insignificant because under the Stock Sale Agreement, ownership could not be diluted without A Cubed's consent. *See* PAB Ex. B at C–1.

**68.** *See In re Emerging Communications, Inc. S'holders Litig.*, 2004 WL 1305745, *38 (Del. Ch.2004) ("The liability of the directors must be determined on an individual basis because the nature of their breach of duty (if any), and whether they are exculpated from liability for that breach, can vary for each director.")

**69.** At oral argument, it became clear that the Insider Majority and Boeckman were driving the litigation train for all the directors. Regrettably, even counsel for the company was taking his cues only from Boeckman and had not spoken to any of the outside directors outside the presence of Boeckman. Transcript of Oral Argument (Nov. 6, 2006) at 27–28.

**70.** *See, e.g., Steiner v. Meyerson*, 1995 WL 441999, at *6 (Del.Ch.1995) ("The waste claim entails no claim of bad faith or conflict of interest (if it did it would be a breach of fiduciary duty claim).").

**71.** *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 74 (Del.2006) (recognizing that the "onerous standard for waste is a corollary of the proposition that where business judgment presumptions are applicable, the board's decision will be upheld unless it cannot be attributed to any rational business purpose").

on terms so disparate that no reasonable person acting in good faith could conclude the transaction was in the corporation's best interest.[72] When pled facts support an inference of waste, judicial nostrils smell something fishy and full discovery into the background of the transaction is permitted. In the end, most transactions that actually involve waste are almost found to have been inspired by some form of conflicting self-interest. The doctrine of waste, however, allows a plaintiff to pass go at the complaint stage even when the motivations for a transaction are unclear by pointing to economic terms so one-sided as to create an inference that no person acting in a good faith pursuit of the corporation's interests could have approved the terms.

Here, plaintiff Sample has met that burden. Despite the directors' view that the grants to the Insider Majority were mundane, I cannot rule out waste. Even in an era when many scholars believe that compensation committees perhaps misunderstand the pertinence of Santa Claus to their work,[73] the grants to the Insider Majority are extraordinary. For a tenth of a penny per share—or some $200 in total—three existing executives got immediate control of nearly a third of a company's voting power, its dividend flow, and its value in the event of any sale. On top of

that, the executives got their taxes paid for them by the company, which had to go into debt in order to bestow that beneficence. In exchange, the company got the three executives to stay without any indication that the three had offers to go elsewhere. After full examination, it might be concluded that these grants were not wasteful.[74] But that examination must be made, at earliest, after discovery is completed.

Finally, the directors ignore the relationship between Sample's disclosure claim and the later action of the Compensation Committee. Clearly, the Committee was purporting to exercise authority granted to it by the stockholders through their approval of the Amendment and the Incentive Plan. If that stockholder approval was obtained through materially misleading disclosures, it is not clear to me how later action of the Committee could cure that basic defect. Certainly the directors have made no argument explaining how that would be so.

For all these reasons, I therefore deny the directors' motion to dismiss Counts I through IV of the complaint.

### B. Sample's Challenge To The Equity Capital Restriction

■ The final count of the complaint seeks a declaration that the Equity Capital

---

72. E.g., Huizenga, 751 A.2d at 892 ("To plead a claim of waste, the plaintiff must allege facts showing that no person of ordinary sound business judgment could view the benefits received in the transaction as a fair exchange for the consideration paid by the corporation.") (internal quotations omitted) (citing Michelson v. Duncan, 407 A.2d 211, 224 (Del.1979); Kaufman v. Shoenberg, 91 A.2d 786, 791 (Del.Ch.1952); Saxe v. Brady, 184 A.2d 602, 610 (Del.Ch.1962); Solomon, 747 A.2d at 1115–16).

73. See, e.g., Lucian Bebchuk & Jesse Fried, Pay Without Performance: The Unfulfilled Promise of Executive Compensation (2004) (questioning the propriety and efficiency of executive com-

pensation practices and recommending proposals for change).

74. I am not insensitive to the fact that the shares were subject to a vesting schedule. But many other allegations—including the desire of the Insider Majority, as reflected in the Boeckman Memos, for control, the non-disclosure of the content of those Memos to the stockholders, the lack of any record that the Insider Majority desired to leave or had good options to leave, the grant of immediate voting and cash flow rights associated with over 30% of the shares and accelerated vesting upon a change in control—contribute to a pleading-stage inference of waste.

Restriction of the Stock Sale Agreement is invalid and unenforceable. The complaint alleges that this provision, which purports to convey to A Cubed approval rights over all new stock issuances by the Randall Bearings board of directors, with the exceptions of the 200,000 shares under the Incentive Plan, for a period of five years, constitutes an abdication of the board's governance authority under 8 *Del. C.* § 141(a). On less extreme grounds, Sample attacks the Equity Capital Restriction as being inspired by entrenchment motives on the part of the Insider Majority. Although Sample has little information on A Cubed, he argues that the Restriction served the Insider Majority by ensuring that no bloc larger than the one the Insider Majority sought to secure for itself could emerge through issuances of new equity.

The directors, in their motion to dismiss, respond on substantive and procedural grounds. Substantively, the directors maintain that under Delaware law, they are permitted to make business decisions that limit their available actions in the future because the alternative would prevent corporate boards from contracting. Moreover, they argue that Sample has not pointed to any improper motive for the Equity Capital Restriction that supports

an inference of a fiduciary breach. Procedurally, they claim that the complaint is deficient because it failed to join indispensable parties to the Stock Sale Agreement—specifically, A Cubed, the purchaser, and Susan Dickerson, the seller.

I treat these issues succinctly.

■ As an initial matter, I reject Sample's argument that the Equity Capital Restriction was invalid in the sense that it overstepped the legal authority of the Randall Bearings board. Although it is undoubtedly correct that a board of directors' authority to issue equity is an important, statutorily-authorized power,[75] that does not mean that a board cannot, for proper business reasons, enter into contracts limiting its ability to exercise that power. Boards of directors necessarily limit their future range of action all the time. For example, a core function of boards is to "manage" the business and affairs of the corporation.[76] One aspect of management involves procuring the factors of production the company needs to do its business. If a board enters into a five-year exclusive agreement to purchase energy, that necessarily limits its freedom to manage its procurement of energy. But that does not mean that the board has "abdicated" its authority to manage,[77] it

---

**75.** *See* 8 *Del. C.* §§ 151–53, 157, 161 & 162 (vesting boards with authority to issue stock and to regulate their corporations' capital structures).

**76.** *See* 8 *Del. C.* § 141(a) (providing that the "business and affairs of every corporation ... shall be managed by or under the direction of a board of directors.").

**77.** The so-called "abdication" authority upon which Sample relies applies to a more extreme situation when the directors can be thought to have given away to a third-party powers that are so crucial to management that the directors are essentially no longer in control of the corporation. *See* PAB at 39–44

(arguing that the "issuance of Randall [Bearings] stock is squarely within the Board's non-delegable authority under Delaware law" and citing, among others, *Grimes v. Donald*, 673 A.2d 1207, 1214 (Del.1996) ("Directors may not delegate duties which lie at the heart of the management of the corporation...."), *Quickturn Design Systems, Inc. v. Shapiro*, 721 A.2d 1281, 1292 (Del.1998) (invalidating a restriction on "the board's power in an area of fundamental importance to the shareholders—negotiating a possible sale of the corporation"), and *Abercrombie v. Davies*, 123 A.2d 893, 898 (Del.Ch.1956) (voiding agreement binding directors to vote in certain ways even if contrary to their best judgment because it would "take all power from the Board to

means that the board has exercised its authority.[78]

Likewise, that the Randall Bearings board agreed, by a contract, to limit its issuance of equity capital for a period of years is not a violation of its legal authority. In fact, although the parties have not shed light on this issue, it would not surprise me to find that corporations issuing equity rather commonly agree to certain restrictions on their ability to issue additional shares. The reason for that suspicion is obvious: the number of company shares in the market is extremely important to a purchaser in determining what price to pay. A board whose company had a corporate charter authorizing a large number of shares and who was seeking to raise equity capital might use a contractual limitation on additional issuances in order to obtain a higher price from buyers to the net benefit of the corporation.

 Rather than condemn such exercises in contracting as illegal, Delaware law uses equity, in the form of principles of fiduciary duty, to ensure that directors do not injure their corporations.[79] Corporate acts thus must be "twice-tested"—once by the law and again by equity.[80] If a contract with a third-party is premised upon a breach of fiduciary duty, the contract may be unenforceable on equitable grounds and the third-party can find itself lacking the rights it thought it had secured.[81] But the

handle matters of substantial management policy")). The more particular limitation embodied in the Equity Capital Restriction is far-removed from that unusual context.

78. See Strine, 60 Bus. Law. at 879–80 (explaining that the Delaware General Corporation Law is an enabling statute providing directors with "capacious authority to pursue business advantage by a wide variety of means" provided that they "act with fidelity [and] care").

79. I understand that certain Supreme Court decisions have purported to address board decisions that limit the future flexibility of the board in a starker manner, reflecting a view that such decisions were illegal, not just inequitable. The decision in *Quickturn Design Systems, Inc. v. Shapiro*, 721 A.2d 1281 (Del. 1998), involving a board's unilateral adoption of a slow-hand poison pill, is an example. But it is easy to reach the same result—namely, a holding that a slow-hand poison pill should be condemned—employing the more nuanced tool of equity. Certainly, that is rather obviously the case in the more extreme instance of a dead-hand poison pill, the only equitable justifications of which would seem to reside in sentiments commonly expressed by dictators seeking to justify their retention of permanent authority in the face of electoral risk (i.e., only they can protect the citizenry). The more controversial majority decision in *Omnicare, Inc. v. NCS Healthcare, Inc.*, 818 A.2d 914 (Del.2003), also condemned as per se invalid certain actions. But

that was in part precisely the reason that the decision was so controversial and drew two well-reasoned dissents. Those actions were specifically authorized by statute and therefore could not be condemned except on equitable grounds.

For present purposes, it is worth noting that both of these decisions were rendered in cases involving board conduct in the mergers and acquisitions context, in which the concern arises that directors may seek to restrict their own authority (or that of their successors) in order to retain control or favor a particular bidder. The Delaware General Corporation Law does not contain provisions that prevent directors from entering into contracts with third-parties for legitimate reasons simply because those contracts necessarily impinge on the directors' future freedom to act. If the judiciary invented such a per se rule, directors would be rendered unable to manage, because they would not have the requisite authority to cause the corporation to enter into credible commitments with other actors in commerce.

80. See Berle, *supra* note 54, at 1049; *see also* Strine, 60 Bus. Law. at 881–83.

81. As explained in the Restatement (Second) of Contracts, a "promise by a fiduciary to violate his fiduciary duty or a promise that tends to induce such a violation is unenforceable on grounds of public policy." Restatement (Second) of Contracts § 193 (1981).

basis for that determination is the fact-intensive one demanded by equity, not a bright-line ruling that the contract is invalid simply because it delimited the range of discretion the directors otherwise had under the law to act.

As applied here, those principles mean that Sample's argument that the Equity Capital Restriction is per se invalid must be rejected. But they leave open his argument that the Equity Capital Restriction resulted from a breach of fiduciary duty by the directors. Although that Restriction is one that it was understandable for A Cubed to request, it was rather odd for Randall Bearings to give it. All that Randall Bearings got for doing so was its facilitation of Susan Dickerson's sale of her large bloc of shares and her agreement to what seem to be rather small reductions in her pre-existing contractual rights against the company. The $8.00 per share A Cubed paid went to Dickerson not the company.

Furthermore, the fact that the Stock Sale Agreement was approved at the same meeting as the board approved the Amendment and the Incentive Plan raises questions at this stage. The Insider Majority appears to have been worried about the consequences for them if the Dickersons' large bloc passed into unfriendly hands, especially in light of the Majority's lack of a large equity stake at that time. The Plan was designed to deal with that problem by providing the Majority with equity that gave them great blocking power. Notably, A Cubed was affiliated with an existing 6.8% stockholder, Roessing Bronze Co., which was also in the bronze business. Although the complaint does not contain facts regarding just what relationship existed between A Cubed,

Roessing, and Randall Bearings, the simultaneity of all these transactions and their relationship to the control of Randall Bearings raises questions whether A Cubed has the sort of relationship to Randall Bearings that might make it a reliable vote for the management slate. Taken in totality, I am chary to rule out the possibility that the directors' decision to agree to the Equity Capital Restriction was the product of fiduciary misconduct through which the Insider Majority sought to ensure that control of Randall Bearings would safely reside in their own hands, by facilitating Susan Dickerson's sale to a friendly purchaser.

 This brings me to the trickier issue, which is the question of whether Sample can proceed with an attack on the Equity Capital Restriction in the absence of Susan Dickerson and A Cubed as parties. The directors contend that those parties are indispensable because if I were to strike down the Equity Capital Restriction in their absence, my ruling could have the effect of rescinding their contract, but in a proceeding in which the parties most directly affected did not have an opportunity to be heard. For his part, Sample argues that because he is only seeking to strike down the Equity Capital Restriction, A Cubed's interests are only tangentially affected and therefore it is not an indispensable party.[82]

Court of Chancery Court Rule 19, titled "Joinder of persons needed for just adjudication," provides the rubric for analyzing the directors' procedural challenge to Sample's claim to invalidate the Equity Capital Restriction because of a failure to join allegedly indispensable parties. Rule

---

**82.** *See* PAB at 46–47 (arguing that "the stock sold by S.L. Dickerson and purchased by A Cubed ... will not be erased, destroyed or impaired by this Court's declaration that the provision at issue is a wrongful abdication by the directors and is invalid").

19(b) provides a non-exhaustive list of possible considerations:

> The factors to be considered by the Court include: *First*, to what extent a judgment rendered in the person's absence might be prejudicial to the person or those already parties; *second*, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; *third*, whether a judgment rendered in the person's absence will be adequate; *fourth*, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.[83]

Considered in their totality, those factors incline me toward the view that neither Dickerson nor A Cubed are indispensable parties. If the only remedial tool available to me were to strike down the Equity Capital Restriction in its entirety, the directors' argument would have more force. But that is not the only instrument.

If Sample shows that the directors' decision to grant the Equity Capital Restriction was tainted by fiduciary misconduct, one possible remedy would be to require the Insider Majority to disgorge the 200,000 shares they received, along with any dividends paid on those shares. The Equity Capital Restriction could be declared invalid, but only to the limited extent that it purported to prevent the company from issuing 200,000 shares other than through the Incentive Plan without A Cubed's consent. That is, by such a ruling, the legitimate interests of A Cubed in not suffering dilution for five years would be protected while giving the company the ability to issue 200,000 shares.[84] Because A Cubed had already agreed to be diluted by that number of shares, any injury to it would be de minimis and it is difficult to conceive how it could argue that the use of the shares for other proper corporate purposes gave it a right to rescind its purchase from Dickerson.[85] Moreover, the enforceability of the Equity Capital Restriction is being vigorously defended by the directors in the absence of A Cubed.[86]

---

**83.** DEL. CH. CT. R. 19(b) (emphasis added).

**84.** A remedial order could stop short of that. It could simply deprive the Insider Majority of the 200,000 shares and give Randall Bearings more clout to argue to A Cubed that it could not reasonably withhold consent to the board's issuance of 200,000 shares for another proper corporate purpose.

**85.** This intrusion is extremely slight when compared to the context of the key case the directors rely upon, which is *Elster v. American Airlines, Inc.*, 106 A.2d 202 (Del.Ch. 1954). *Elster* involved a situation when the result of a ruling would be to cancel stock options of persons not before the court, thereby destroying the assets of the option holders. 106 A.2d at 204.

**86.** A case illustrative of the more nuanced analysis required by the current version of Rule 19 is *Commonwealth Associates v. Providence Health Care, Inc.*, 1993 WL 432779 (Del.Ch.1993). In that decision, Chancellor Allen granted a preliminary injunction preventing the counting of any votes of stock in Providence Health Care, Inc. owned by an absent party, NuMed Home Health Care, Inc., in the context of a consent solicitation. Noting that NuMed had acquired its shares in a transaction with Providence through contracts seeming to have the purpose of preserving the founding family's control of Providence, that NuMed was aware of the connection between its contracts with Providence and the consent solicitation, and that NuMed's position was being championed by Providence, Chancellor Allen exercised his discretion to afford the requested relief even though he could not prevent prejudice to NuMed. *Id.* at *10–*11.

In this case, the prejudice, if any, to A Cubed by relief of the kind I described is far less substantial than resulted from the relief awarded in the *Commonwealth* case. But what is similar to that case is the reality that the directors are championing A Cubed's interests. Furthermore, given A Cubed's con-

### VII. *Conclusion*

For the foregoing reasons, the defendants' motion to dismiss under Court of Chancery Rules 12(b)(6) and 19(b) is DENIED. IT IS SO ORDERED.

scious decision (as a stockholder of a Delaware corporation) to enter into an agreement restricting the ability of a Delaware corporation to issue shares without its consent, a suit in this court can hardly be surprising to it, or to Dickerson, who was a director as of the time of the Stock Sale Agreement and who left the board as part of a larger quid pro quo involving the Agreement. Sample has not tried to name Dickerson or A Cubed as parties but non-frivolous grounds for the assertion of personal jurisdiction over them may well exist. As a protective matter, I order Sample at the very least to give notice to A Cubed and Dickerson so that they may intervene if they wish. Also, if Sample wishes to amend his complaint to add them as defendants, he has leave to do so.