# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| AVANDE, INC., a Delaware corporation | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2018-0203-AGB |
| | ) | |
| SHAWN EVANS and DC RISK SOLUTIONS, INC., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted: May 21, 2019
Date Decided: August 13, 2019

Thad J. Bracegirdle and Julie M. O'Dell, WILKS, LUKOFF & BRACEGIRDLE, LLC, Wilmington, Delaware; Jerome R. Bowen, BOWEN LAW OFFICES, Las Vegas, Nevada; *Attorneys for Plaintiff Avande, Inc..*

Sean J. Bellew, BELLEW, LLC, Wilmington, Delaware; *Attorney for Defendants Shawn Evans and DC Risk Solutions, Inc.*

**BOUCHARD, C.**

This post-trial decision resolves various claims that Avande, Inc., a privately held medical claims management company, brought against its former CEO and director Shawn Evans and a company he owns, DC Risk Solutions, Inc. Avande contends that Evans breached his duty of loyalty by engaging in self-interested transactions, authorizing improper expenditures of company funds, and failing to maintain appropriate documentation of company expenditures. For this, Avande seeks over $5.3 million of damages, which equals approximately 45% of all the expenses Avande incurred to operate its business from its inception in 2013 until Evans was terminated as CEO in February 2018.

As explained below, the court concludes that Avande is entitled to damages, but only in the amount of $21,817.70, and to an accounting of payments that Avande made to DC Risk Solutions, Inc., which it quantifies to be $235,845.83   Defendants are entitled to judgment in their favor on all other claims.

## I.     BACKGROUND

The facts recited in this opinion are my findings following a three-day trial held in February 2019. The record includes live testimony from five witnesses, approximately 450 exhibits, stipulations of fact in the Pre-Trial Stipulation and Order ("PTO"), and twelve depositions.[1]

---

[1] Two of the trial witnesses have the same last name:  defendant Shawn Evans and an outside accountant Avande hired named Rick Evans.  This decision refers to Shawn Evans as "Evans" and to Rick Evans by his full name.

**A.    The Players**

Avande, Inc is a privately held Delaware corporation that was formed on February 23, 2016, before which time its business was pursued through Avande, LLC, a Delaware limited liability company that was formed in April 2013.[2]  For simplicity, unless otherwise noted, the court refers to both entities together as "Avande" or the "Company."  Avande's principal place of business is in North Augusta, South Carolina.[3]

Defendant Shawn Evans is a resident of San Francisco, California who served as a director and the Chief Executive Officer of Avande, Inc. from February 23, 2016 until February 15, 2018.[4]  Evans previously served as the Managing Member and Chief Executive Officer of Avande, LLC.[5]  Evans is the owner of defendant DC Risk Solutions, Inc. ("DC Risk"), an insurance brokerage and consulting firm based in San Francisco, California, where it is incorporated.[6]

Two other individuals prominent in this action are Dr. Norman Kato and Mehmet Ergun, who both served as managers of Avande LLC and then as directors

---

[2] PTO ¶¶ 1, 3; JX 14.

[3] PTO ¶ 1.

[4] PTO ¶¶ 7-8.

[5] PTO ¶ 9.

[6] PTO ¶ 10; Tr. 5 (Evans).

of Avande, Inc.[7]  Kato served as Avande, Inc.'s Chief Medical Officer from its inception through February 15, 2018, and is currently Chief Executive Officer and a director.[8]  Ergun was the Chief Technology Officer from Avande's inception until his death on August 31, 2017.[9]

## B.  Avande's Formation, Management, and Capital Structure

Before Avande was formed, Kato had developed an independent consulting practice to review hospital bills for insurance companies and to perform "prior authorization" services.[10]  "Prior authorization is a process where physicians and hospitals submit their requests for services" to an insurer so that the insurer may determine if the services requested are medically necessary.[11]  Toward the end of 2012, seeing a business opportunity, Kato decided to start a company to provide these types of services and recruited Ergun and Evans to join him.[12]

In April 2013, Kato formed Avande, LLC as a new medical management business to perform prior authorization and hospital billing review services for insurers.[13]  Ansera Cloud Services, LLC was formed simultaneously to develop,

---

[7] PTO ¶ 14; JX 14 at AVANDE0023353.

[8] PTO ¶ 15; Tr. 401 (Kato).

[9] PTO ¶¶ 16, 19.

[10] Tr. 402-03 (Kato).

[11] Tr. 403-04 (Kato).

[12] Tr. 404-07 (Kato)

[13] JX 14; Tr. 405-06 (Kato).

operate, and manage the internet "cloud application" and related technology that Avande LLC would use to serve its clients.[14]

Kato, Evans, and Ergun divided up their responsibilities into three areas. Kato, as the Chief Medical Officer, "was the medical guy" who had the client relationships and performed the "medical reviews" for clients.[15] Ergun, as the Chief Technology Officer, was responsible for information technology, including "building out systems" for the Company.[16] Evans, as the CEO, described his responsibilities as extending to anything that Kato and Ergun did not do, which included administrative and financial matters.[17] For a time, Evans oversaw financial matters as the Chief Financial Officer, but beginning in 2015, Evans engaged an outside CFO service called NowCFO and used a CPA (Ronald J. Ruttenberg) to produce its year-end financial reports.[18]

In February 2016, Kato, Evans, and Ergun decided to restructure Avande LLC and convert it into a Delaware corporation.[19] On February 23, 2016, pursuant to the terms of a Stock Purchase Agreement, all the membership interests in Avande LLC

---

[14] Tr. 408-09 (Kato); Tr. 152 (Evans).

[15] Tr. 14 (Evans); Tr. 408 (Kato).

[16] Tr. 14 (Evans); Tr. 408 (Kato).

[17] Tr. 14 (Evans): Tr. 408 (Kato).

[18] Tr. 271-72, 384-85 (Evans)

[19] Tr. 412-13 (Kato).

4

and Ansera Cloud Services, LLC were exchanged for shares of Avande, Inc. stock.[20] Avande, LLC and Ansera Cloud Services LLC initially operated as wholly-owned subsidiaries of Avande, Inc. but later were merged into Avande, Inc.[21] On December 13, 2016, a certificate of cancellation for Avande, LLC was filed with the Delaware Secretary of State and Avande, Inc. assumed all of its rights and obligations.[22]

After forming Avande, Inc., Kato, Evans, and Ergun served as its directors.[23] Five people owned Avande's common stock at the time, apportioned as follows: Kato owned 43.0108%, Evans owned 30.466%, Ergun owned 23.2975%, and two others, Donna Gentile and Peter Dumich, owned 1.7921% and 1.4337%, respectively.[24] The Company's three officers each resided and worked in a different location: Kato in Los Angeles, Evans in San Francisco, and Ergun circulated between Turkey, Mexico and two locations in California—San Diego and Irvine.[25]

### C.   Other Businesses Owned and Operated by Avande's Principals

Avande, LLC's operating agreement permitted managers to engage in outside business ventures.[26] This practice continued after the formation of Avande, Inc.

---

[20] PTO ¶¶ 3-4; JX 131 at AVANDE0009345; Tr. 412 (Kato).

[21] PTO ¶ 4; Tr. 152-53 (Evans).

[22] PTO ¶¶ 5-6.

[23] PTO ¶ 14.

[24] PTO ¶ 13.

[25] Tr. 377 (Evans); Tr. 425 (Kato).

[26] JX 14 § 6.7(a).

While working for Avande, Ergun owned and operated Avandel, Inc. ("Avandel"), which provided all of Avande's IT services, including the development of add-on software solutions to the Salesforce platform on which the Company operated.[27] Avandel employed many programmers, who worked mostly in Turkey.[28]

As Kato was aware, Evans owned and operated DC Risk while working for Avande.[29] As Avande's CEO, Evans arranged for Avande to purchase insurance policies that were brokered by DC Risk.[30] Avande also utilized a DC Risk employee, Susan Omran, for bookkeeping services.[31] According to Evans, all three directors made the decision to use Omran as an employee of DC Risk, where she was eligible for benefits.[32]

While working for Avande, Evans also owned part of two other companies, Scooter Ricambi and Euro Classix Cars, which Kato was not aware of.[33] In 2017, while he was still CEO of Avande, Evans purchased Podiatry Plan, which is a

---

[27] Tr. 14 (Evans); Tr. 638 (Taciroglu); Evans Dep. 85.

[28] Tr. 173, 377 (Evans).

[29] Tr. 447 (Kato).

[30] PTO ¶¶ 42-43.

[31] Tr. 24 (Evans).

[32] Tr. 71 (Evans).

[33] Tr. 72 (Evans); Tr. 447 (Kato).

"network of podiatrists" that provides services similar to those provided by Avande, but only in the field of podiatry.[34]

### D. Avande Experiences Financial Troubles

Over time, tensions developed between Evans and Kato due, in part, to financial difficulties that Avande experienced during Evans' tenure as CEO.[35] In October 2016, Medical Benefits Mutual Life Insurance Co. ("MedBen"), one of Avande's largest clients, was requesting that Avande repay it $426,219.[36] Given the nature of Avande's business, having to refund payments received from clients is a business risk. As Kato testified:

> Avande makes its money through savings on hospital bills. . . . So if a bill comes in, let's say at $100,000, and we can save 50,000, so the ultimate payout is only $50,000, then we get 35 percent. 5 percent goes back to the third-party administrator for administrative fees. We keep the other 30 percent.[37]

If a hospital refuses to accept the discount that a client applies based on Avande's recommendation, however, Avande could be required to repay the client for funds remitted to Avande upfront in expectation of realizing the savings.[38]

---

[34] Tr. 40, 68 (Evans); PTO ¶ 45; Tr. 476-80 (Kato).

[35] Tr. 638 (Taciroglu); Tr. 427 (Kato); JX 195.

[36] JX 186.

[37] Tr. 429 (Kato).

[38] Tr. 430 (Kato).

With respect to MedBen, there was a contractual relationship between the hospital and an employer group that did not allow for any repricing, so Avande had to return to MedBen what it had already received for all cases involving that employer group.[39] This proved to be difficult for Avande, because, as Evans put it "[w]e're a $3 million company being asked to pay back $400,000 in cash and an additional almost $200,000 in accounts receivable write-offs."[40] Kato placed the blame for the MedBen problem on Evans, contending that he should have reserved more of the money the Company received upfront from MedBen given the risk of having to pay it back.[41]

On the heels of the problems with MedBen and the financial strain it put on the Company, Kato and Ergun expressed concerns about Evans' spending habits, including his traveling first class and staying at high-end hotels.[42] On December 13, 2016, in an advance of a board meeting scheduled that day, Ergun proposed a series of resolutions to enact a formal travel policy and restrict the ability of all officers to authorize material expenditures of Company funds, hire employees, or modify their compensation.[43] The board ultimately approved a resolution requiring prior board

---

[39] Tr. 431 (Kato).

[40] Tr. 26-27 (Evans).

[41] Tr. 514 (Kato).

[42] Tr. 443 (Kato); JX 151; JX 170.

[43] JX 199; Tr. 441-43 (Kato).

approval (i) to hire or terminate employees and to set or modify their compensation terms and (ii) "for any expenditure by the Company exceeding $10,000."[44]  The board also decided to adopt a formal corporate travel policy at a later meeting and determined "that in the interim, all corporate travel would be conducted at coach fare."[45]

### E.    Ergun's Death and Subsequent Corporate Changes

On August 31, 2017, Ergun died unexpectedly.[46]  This tragic event created a vacancy on Avande's board and led to a deadlock between Evans and Kato.  Before his death, Ergun had served as a "go-between" who maintained the "balance" when Kato and Evans disagreed.[47]  Ergun's death eliminated that balance and, because he died intestate, Ergun's Avande shares could not be voted in an election of directors until a representative for his estate was appointed.[48]

Around the time of Ergun's death, Kato was communicating with William Witenberg, a financial consultant for Avande, to discuss options for terminating Evans' role in the Company.[49]  Those discussions touched on a disagreement

---

[44] JX 198; PTO ¶17.

[45] JX 198.

[46] PTO ¶ 19.

[47] Tr. 15 (Evans); Tr. 456 (Kato).

[48] PTO ¶ 19; Tr. 458 (Kato).

[49] Tr. 535-36, 554-56 (Kato); JX 267; JX 291.

9

between Kato and Evans concerning how to best calculate the cost of conducting a medical review to determine what contracts were profitable for Avande. At some point, Kato had Ali Taciroglu, Avande's Chief Operating Officer at the time, calculate the "true cost per authorization."[50] In an August 30, 2017 email, Kato indicated to Witenberg that he was not planning to provide this information to Evans, stating he "did not want [Evans] trying to figure out the correct numbers" in order to "leave him in the dark and let him hang himself as he signs the new essentially worthless contracts since [his] new clients are not sending in any new cases."[51] Kato did not tell Taciroglu to keep his cost calculations secret from Evans, and Taciroglu ultimately shared them with Evans.[52]

In the wake of Ergun's death, Kato made multiple requests for Evans to participate in a stockholders' meeting to elect directors and eventually scheduled one to be held in San Jose.[53] Evans refused to attend, which prevented a quorum because in addition to the absence of his shares, no one had been appointed as a representative with the authority to vote Ergun's shares, which together accounted for approximately 53.8% of the Company's outstanding shares.[54]

---

[50] Tr. 538 (Kato); Tr. 647 (Taciroglu).

[51] JX 267.

[52] Tr. 647 (Taciroglu).

[53] Tr. 458 (Kato); PTO ¶ 21.

[54] Tr. 458 (Kato).

On January 8, 2018, Kato filed an action under 8 *Del. C.* § 211 to compel an annual meeting of the Company's stockholders, which had not been held for more than thirteen months.[55] On February 5, 2018, this court entered a judgment in Kato's favor and ordered Avande to hold an annual meeting of stockholders on February 15, 2018.[56] At this meeting, Kato, Witenberg, and Peter Dumich were validly elected as directors of Avande, and Evans was not reelected.[57] After the meeting, the new board validly terminated Evans from his position as CEO and appointed Kato as the new CEO.[58]

## F.    Evans' Actions after his Termination

On February 15, 2018, immediately after his termination as CEO, Evans sent Avande a written demand for repayment of loans with an outstanding principal amount at the time of approximately $169,000 that he and his wife had made to Avande the previous September to help stabilize the Company.[59] On February 20, 2018, Avande's counsel responded, stating that Evans' "demand for immediate payment is premature at best under the circumstances" as "the new leadership will need time to obtain and review all relevant documentation, financial and otherwise,

---

[55] PTO ¶ 23; *Kato v. Avande, Inc.*, C.A. No. 2018-0008-AGB.

[56] PTO ¶ 24.

[57] PTO ¶¶ 25-26.

[58] PTO ¶¶ 27, 30.

[59] PTO ¶ 32; JX 271; JX 416.

to make any reasonable determination as to the real financial condition of the company as well as any alleged outstanding obligations."[60]

On March 1, 2018, Evans and his wife filed suit against Avande in California state court seeking to compel the Company to repay their loans.[61] On June 7, 2018, the California Superior Court stayed that case pending adjudication of this action.[62]

Evans admits taking certain actions after his termination that had the potential to harm Avande. During this period, Evans contacted creditors of Avande to encourage them to take legal action against Avande in an effort to cause an involuntary bankruptcy of the Company.[63] Evans also contacted Luke Burchard, a medical director at Avande, and invited him to leave Avande in order to join Evans in a new venture.[64]

### G. Internal Audit and Investigation after Evans' Termination

After Evans was terminated, Kato and other Avande employees began to assess the financial situation of Avande.[65] Both Kato and Avande's counsel requested that Evans turn over all Avande documents in his possession, but Evans

---

[60] JX 344.

[61] PTO ¶ 37.

[62] JX 390.

[63] PTO ¶¶ 35-36.

[64] PTO ¶ 31; Tr. 658-59, 665-67 (Burchard); JX 352.

[65] Tr. 461-62 (Kato).

did not do so.[66] Kato, together with Avande's bookkeeper Stephanie Taylor, undertook an audit, and Kato for the first time learned of various suspect transactions, such as the purchase of a scooter for Ergun from a company in which Evans had an ownership interest, and payments to a private school and ballet studio attended by the children of a consultant who periodically provided services to the Company.[67] It also was discovered that Evans had not paid invoices to Avande clients and vendors; for example, Avande had not paid twenty-four invoices, totaling $45,613.72 to MedBen that were over 605 days past due.[68]

In March 2018, Avande engaged Rick Evans and his accounting firm Serotta Maddocks Evans & Co., CPAs ("Serotta") to assist in preparing Avande's financial statements and tax returns for 2017.[69] Later in March, Avande learned that the IRS would be conducting a field audit on its 2016 tax return, and Serotta's engagement was expanded to include the audit.[70] An IRS agent informed Rick Evans that this was a random audit.[71]

---

[66] JX 459; JX 344; Tr. 108 (Evans).

[67] Tr. 467 (Kato).

[68] JX 385 (MedBen); Tr. 475-76 (Kato).

[69] JX 448; Tr. 589 (R. Evans).

[70] Tr. 592 (R. Evans).

[71] JX 369A; Tr. 596, 617 (R. Evans).

Serotta attempted to secure the records sought by the IRS, but discovered that some of these documents, including Form 1099s, credit card statements, bank records, receipts, and invoices, could not be located.[72] In September 2018, Avande's counsel requested that Evans provide any and all documentation concerning Avande in his possession to the Company to assist its response to the IRS's audit requests.[73] Evans did not respond to Avande, but provided the documents to his counsel, who produced copies during discovery in this case.[74] As of the time of trial, the IRS audit was still ongoing.[75]

## II.    PROCEDURAL HISTORY

On March 22, 2018, the Company filed its original complaint in this action, which it amended on May 30, 2018 (the "Amended Complaint").[76] The Amended Complaint contains six claims. Count I asserts a claim for declaratory judgment pertaining to Evans' termination as Avande's CEO. Count II asserts that Evans breached his fiduciary duties. Count III asserts a claim for tortious interference with contract and business relations. Count IV asserts a claim for defamation and/or trade

---

[72] Tr. 595 (R. Evans)

[73] JX 402.

[74] Tr. 109-10 (Evans).

[75] Tr. 616 (R. Evans).

[76] Dkts. 1, 12.

14

libel. Count V asserts a claim for conversion. Count VI asserts that Avandel and DC Risk aided and abetted Evans in breaching his fiduciary duties.

On June 13, 2018, Evans filed an answer and counterclaims against Avande and its current board, consisting of Kato, Dumich, and Witenberg.[77] Evans also moved for expedited proceedings, which the court denied on June 22, 2018.[78]

On September 28, 2018, the parties filed a stipulation in which (i) Evans voluntarily dismissed without prejudice his counterclaims, as amended, (ii) DC Risk withdrew a motion to dismiss for lack of personal jurisdiction that it had filed, and (iii) the parties requested a compact schedule to adjudicate Avande's claims, with trial scheduled to begin on February 20, 2019.[79]

On December 28, 2018, the deadline to exchange expert reports, Avande produced a three-page letter from Rick Evans of Serotta. The letter advised that Avande's financial statements could not be audited due to a lack of corroborating documentation and listed certain categories of unavailable documents, but it did not explain what opinions Rick Evans intended to offer at trial and did not contain any opinion about the amount of damages Avande was seeking in this action.[80]

---

[77] Dkt. 16.

[78] Dkts. 17, 31.

[79] Dkts. 60, 61.

[80] JX 412.

On February 7, 2019, Avande served on defendants a 41-page "supplemental expert report" consisting of an engagement letter, various spreadsheets quantifying alleged damages to Avande, and backup documentation.[81] Later that day, defendants moved to strike the supplemental expert report.[82] The court granted this motion at the pretrial conference held on February 14, 2019, explaining that the production of what was a "new report from a previously designated expert" forty days after the agreed-upon deadline for expert reports, about fifteen hours before the expert was scheduled to be deposed, and less than ten days before trial was inexcusable and prejudicial to defendants.[83] The court further explained that it was not precluding Rick Evans from testifying as a fact witness.[84]

On February 19, 2018, the day before trial began, defendants filed a motion seeking to exclude Rick Evans as a witness at trial in any capacity, arguing that it was improper to call him as a fact witness and that his initial expert report contained no opinions that would justify calling him as an expert.[85] The court denied the

---

[81] JX 425.

[82] Dkt. 123.

[83] Pre-Trial Tr. 53-54 (Feb. 14, 2019) (Dkt. 170).

[84] Pre-Trial Tr. 58.

[85] Dkt. 164.

motion, reiterating that Rick Evans could "testify in his capacity as a fact witness" and as an expert as to his three-page letter that was served on December 28.[86]

A three-day trial was held in February 2019. During post-trial briefing, the Company did not brief and thus waived its claims for declaratory relief, tortious interference with contract and/or business relations, defamation and/or trade libel, and conversion.[87] Accordingly, judgment will be entered in defendants favor on Counts I, III, IV, and V of the Amended Complaint. As to Count IV, Avande previously filed a voluntary notice of dismissal of its aiding and abetting claim against Avandel.[88] Thus, what remains for decision in the discussion that follows is Avande's claim against Evans for breach of fiduciary duty (Count II) and against DC Risk for aiding and abetting (Count VI).

---

[86] Tr. 343. In clarifying the line between fact and expert witness, Avande's attorney agreed that Rick Evans "would not be . . . giving an independent opinion now, as opposed to repeating what he advised the company in the past as an advisor to the company, about whether certain things are legitimate business expenses or not." *Id.* 203-04. Rick Evans, who was not proffered as an expert at trial, conceded that his December 28, 2018 letter did not contain any opinions, and was precluded from offering other opinions. *Id.* 613-15 (R. Evans), 631-32 (sustaining objections).

[87] *Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived.").

[88] Dkt. 113.

## III. ANALYSIS

During post-trial argument, Avande explained that it is seeking entry of a judgment against Evans for breach of fiduciary duty relating to three categories of alleged damages totaling $5,372,758.33. Each of these categories covers the period from the Company's inception in 2013 to January 2018, shortly before Evans was terminated as Avande's CEO. The three categories are as follows:

- $4,691,097 of expenses that Avande contends the IRS could disallow as deductible business expenses.

- $235,845.83 of payments Avande made to DC Risk.

- $445,815.50 equal to 50% of the Evans' compensation as CEO.[89]

The court's analysis of Avande's claims against Evans and DC Risk with respect to each category is set forth in Sections B-E below. Before turning to that analysis, the court will address Evans' affirmative defense under the unclean hands doctrine.

### A. Evans Has Failed to Prove an Unclean Hands Defense

Evans asserts that Avande should be barred from obtaining any relief in this action under the doctrine of unclean hands on the theory that, "[a]s early as August 2017, Kato began conspiring with William Wittenberg [sic] to undermine Evans in an effort ultimately calculated to secure his removal from the Company."[90] For

---

[89] Post- Trial Tr. 24-25, 36-37 (May 7, 2018) (Dkt. 188).

[90] Defs.' Answering Br. 27.

support, Evans relies primarily on an email Kato sent to Witenberg on August 30, 2017, where Kato stated that he did not want to alert Evans to certain cost figures that Taciroglu had calculated because he wanted to let Evans "hang himself" by continuing to use incorrect cost figures when negotiating contracts with clients.[91]

The doctrine of unclean hands is an affirmative defense that allows this court to deny relief to a party who acts in bad faith:

> When one files a bill of complaint seeking to set the judicial machinery in operation and to obtain some remedy has violated conscience or good faith or other equitable principles in his conduct, then the doors of the Court of Equity should be shut against him. The Court should refuse to interfere on his behalf to acknowledge his right or to award him a remedy.[92]

In order to establish unclean hands, "the plaintiff's conduct [must be] so offensive to the integrity of the court that his claims should be denied, regardless of their merit."[93] And "the inequitable conduct must have an 'immediate and necessary' relation to the claims under which relief is sought. To operate otherwise would invite courts to act in a constabulary rather than judicial capacity."[94]

Defendants have not established that Avande acted with unclean hands. To start, the cited conduct of Kato was not exceptionally offensive. Defendants object

---

[91] JX 267.

[92] *Bodley v. Jones*, 59 A.2d 463, 469 (Del. 1947).

[93] *Gallagher v. Holcomb & Salter*, 1991 WL 158969, at *4 (Del. Ch. Aug. 16, 1991).

[94] *Nakahara v. NS 1991 Am. Tr.*, 718 A.2d 518, 523 (Del. Ch. 1998) (internal footnotes omitted).

to Kato seeking to remove Evans from the Company, but he was within his rights to do so. The record shows that the relationship between Kato and Evans had deteriorated significantly by December 2016, when Avande experienced financial troubles because of the need to repay MedBen.[95] In Kato's view, Evans was responsible for this problem because he failed to reserve sufficient funds for this contingency.[96] After Ergun's death in 2017, the relationship between Kato and Evans eroded further, ultimately leading to his removal as a director of the Company at a court-ordered meeting of stockholders and as an officer by the Company's newly elected board in February 2018. Both of these actions were concededly valid.[97]

With respect to the August 2017 email exchange with Witenberg, Kato credibly explained his frustration that Evans had signed up "money-losing" contracts and would not heed his concerns about making sure that contracts with clients were negotiated on terms that would cover the Company's costs.[98] Kato telling Witenberg that he wanted Evans to fail because of his own incompetence was an act of bad management on his part, but that action does not come close to being so offensive as to warrant barring Avande's claims for relief.

---

[95] JX 195; Tr. 426-28 (Kato).

[96] Tr. 514 (Kato).

[97] PTO ¶¶ 26-27.

[98] Tr. 538-39 (Kato).

20

Further, the nexus between Evans' alleged breaches of fiduciary duty and Kato's interactions with Witenberg is highly attenuated.[99] The vast majority of the expenditures for which Avande seeks recourse against Evans, which date back to 2013, predated the Kato-Witenberg August 2017 email exchange and their later discussions about removing Evans from the Company. The "immediate and necessary" relationship between the alleged "inequitable conduct" and "the claims under which relief is sought" thus has not been established to support an unclean hands defense.[100]

## B. The Legal Framework

The gravamen of Avande's single claim against Evans is that he breached his duty of loyalty to Avande as a director and as its CEO by engaging in self-dealing transactions, acting in bad faith, and committing waste.[101] Importantly, what is not at issue in this case is whether Evans breached his duty of care. This is because Evans is exculpated from liability for breaches of the duty of care in his capacity as a director of Avande under its certificate of incorporation,[102] and because Avande

---

[99] *Nakahara*, 718 A.2d at 523.

[100] *Id*.

[101] Although some of the events in this case date back to the predecessor of Avande, Inc. (Avande, LLC), the parties analyzed the legal issues in this case solely based on the law applicable to a fiduciary of a corporation governed by the Delaware General Corporation law and accordingly the court uses the same framework.

[102] JX 132 at Art. VIII.

21

did not fairly raise a claim against Evans for breach of the duty of care in his capacity as an officer of Avande.[103]

"The duty of loyalty requires that a corporate fiduciary act with undivided and unselfish loyalty to the corporation and that there shall be no conflict between duty and self-interest."[104]  "If corporate fiduciaries stand on both sides of a challenged transaction, an instance where the directors' loyalty has been called into question, the burden shifts to the fiduciaries to demonstrate the 'entire fairness' of the transaction."[105]  "[I]n a typical self-dealing transaction, the fiduciary is *the recipient* of an allegedly improper personal benefit, which usually comes in the form of obtaining something of value or eliminating a liability."[106]

---

[103] In its reply brief, Avande asserted that "Evans cannot be exculpated from liability for any acts that he undertook unilaterally under his authority as Avande's CEO." Pl.'s Reply Br. 25.  Avande, however, did not fairly raise in its opening brief that it was seeking to recover damages from Evans in his capacity as an officer under a due care theory. *See* Pl.'s Opening Br. 26-39 (asserting that Avande had proven a non-exculpated claim for breach of Evans' fiduciary duty of loyalty and not advancing a claim for breach of the duty of care); Post-Trial Tr. 18-20 (conceding that Avande did not advance a duty of care argument against Evans in its opening brief).  Avande thus waived its right to assert a duty of care claim. *See Zutrau v. Jansing*, 2013 WL 1092817, at *6 (Del. Ch. Mar. 18, 2013) (noting that "[u]nder the briefing rules, a party is obliged in its motion and opening brief to set forth all of the grounds, authorities and arguments supporting its motion" and that "courts routinely have refused to consider arguments made in reply briefs that go beyond responding to arguments raised in a preceding answering brief").

[104] *Oliver v. Boston Univ.*, 2006 WL 1064169, at *18 (Del. Ch. Apr. 14, 2006) (internal quotation marks omitted).

[105] *Id.*

[106] *Personal Touch Hldg. Corp. v. Glaubach*, 2019 WL 937180, at *19 (Del. Ch. Feb. 25, 2019).

Once entire fairness applies, "the defendants must establish to the court's satisfaction that the transaction was the product of both fair dealing *and* fair price."[107] "[T]he test for fairness is not a bifurcated one as between fair dealing and price. All aspects of the issue must be examined as a whole since the question is one of entire fairness."[108]

"The duty of loyalty includes a requirement to act in good faith."[109] "To act in good faith, a director must act at all times with an honesty of purpose and in the best interests and welfare of the corporation."[110] "A failure to act in good faith may be shown, for instance, where the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation, where the fiduciary acts with the intent to violate applicable positive law, or where the fiduciary intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties."[111]

"Corporate waste occurs when a corporation is caused to effect a transaction on terms that no person of ordinary, sound business judgment could conclude

---

[107] *In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 44 (Del. Ch. 2013) (internal quotation marks omitted).

[108] *Weinberger v. UOP, Inc.*, 457 A.2d 701, 711 (Del. 1983).

[109] *In re Orchard Enters., Inc. S'holder Litig.*, 88 A.3d 1, 32 (Del. Ch. 2014).

[110] *In re Walt Disney Co. Deriv. Litig.*, 907 A.2d 693, 755 (Del. Ch. 2005), *aff'd*, 906 A.2d 27 (Del. 2006).

[111] *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 67 (Del. 2006).

represent a fair exchange."[112]  Waste is "a residual protection for stockholders that

polices the outer boundaries of the broad field of discretion afforded directors by the

business judgment rule" and may be best conceptualized as allowing a plaintiff to

state a claim "even when the motivations for a transaction are unclear by pointing to

economic terms so one-sided as to create an inference that no person acting in a good

faith pursuit of the corporation's interests could have approved the terms."[113]  Waste

has been viewed as being covered by an exculpation provision,[114] but this court has

noted that it "also can be understood as a means of proving bad faith conduct" and

"could fall outside the exculpatory provision."[115]

Unless otherwise indicated below, Avande "ha[s] the burden of proving each

element, including damages, of each" cause of action "by a preponderance of the

evidence."[116]  "[P]roof by a preponderance of the evidence means that something is

more likely than not."[117]

---

[112] *Steiner v. Meyerson*, 1995 WL 441999, at * 1 (Del. Ch. July 19, 1995) (Allen, C.).

[113] *Sample v. Morgan*, 914 A.2d 647, 669-70 (Del. Ch. 2007) (Strine, VC).

[114] *Green v. Phillips*, 1996 WL 342093, at *6-7 (Del. Ch. June 19, 1996).

[115] *Amalgamated Bank v. Yahoo! Inc.*, 132 A.3d 756, 786 (Del. Ch. 2016), *abrogated on other grounds*, *Tiger v. Boast Apparel, Inc.*, --A.3d--, 2019 WL 3683525 (Del. Aug. 7, 2019) (citing *Sample*, 914 A.2d at 670).

[116] *Physiotherapy Corp. v. Moncure*, 2018 WL 1256492, at *3 (Del. Ch. Mar. 12, 2018) (internal quotation marks omitted).

[117] *Id.* (internal quotation marks omitted).

## C. Transactions Purportedly Lacking Proper Documentation

Avande's first category of alleged damages consists of $4,691,097 of expenses the deductibility of which the IRS purportedly could disallow for lack of supporting documentation. Rick Evans of the Serotta firm calculated this figure. He began by identifying the amount of expenses recorded in the Company's ledgers from the Company's inception in 2013 through January 2018, from which he subtracted four items:[118]

| Total Expenses | $11,765,503 |
|---|---|
| 1. Salaries & Wages, Payroll Taxes, Benefits | 6,103,267 |
| 2. Depreciation, Amortization | 92,718 |
| 3. Specialty Health | 762,109 |
| 4. Other Expenses Exhibiting Evidence of Proper Authorization or Expense Receipts Exhibiting Evidence of Business Purpose | 116,312 |
| Expenses Subject to Disallowance by IRS | $4,691,097 |

The $4,691,097 result of this calculation is referred to hereafter, at times, as the "Challenged Amount."

Of the Challenged Amount, the Company specifically has questioned only six expenditures that account for less than 1% (or approximately $30,500) of the expenses at issue. Instead of attempting to isolate any other specific items or

---

[118] Tr. 605-06 (R. Evans); JX 425 at 5.

categories of expenses within the Challenged Amount that it believes are problematic, Avande argues that Evans should bear the burden to prove the fairness of each and every expense making up the Challenged Amount based on a line of cases emanating from this court's decision in *Technicorp Int'l II, Inc. v. Johnston.*[119] The court turns to this issue next and then will address the four specifically challenged items.

### 1. Avande Has Failed to Make the *Prima Facie* Showing Necessary to Shift to Evans the Burden of Proving the Fairness of Expenditures Within the Challenged Amount

In *Technicorp*, this court found after trial that two individuals (Johnston and Spillane) had "systematically looted" over a twelve-year period two companies: Technicorp International II, Inc. (TCI II) and its subsidiary Statek, Inc.[120] The fact that Johnston and Spillane "exclusively managed and controlled TCI II and Statek, including all access to their cash and corporate records" during this period, "while keeping the corporate books and records in such a way as to minimize, if not altogether avoid, the risk of being held accountable," complicated the corporations' efforts to recover their losses after control of TCI II and Statek had changed hands.[121]

---

[119] 2000 WL 713750, at *2 (Del. Ch. May 31, 2000).

[120] *Id.* at *1.

[121] *Id.*

After retaining an expert "to perform six months of painstaking, highly intricate forensic accounting work," TCI II and Statek asserted that Johnston and Spillane had "wrongfully diverted to themselves at least $28.5 million of those corporations' assets in several different ways," consisting of approximately $11.5 million from TCI II and $17 million from Statek.[122] Two aspects of the court's analysis of these claims are relevant here.

First, based on the testimony of plaintiffs' expert and other evidence, the court found that "plaintiffs have established, *prima facie*" that all of the TCI II funds at issue (approximately $11.5 million) "were paid to Johnston, Spillane, and the Johnston entities, all of whom Spillane confirmed were the recipients of those funds."[123] Given this *prima facie* showing that the claims involving use of TCI II's funds were entirely self-interested, the court shifted to the defendants the burden "to account for their disposition of those funds:"

> And where, as here, the fiduciaries cause those funds to be used for self-interested purposes, *i.e.,* to be paid to themselves or to others for the fiduciaries' benefit, they have the burden of establishing entire fairness, sufficient to pass the test of careful scrutiny by the court.[124]

Second, the court engaged in a similar analysis with respect to approximately $1.1 million of charges on Statek credit cards issued to Johnston and Spillane:

---

[122] *Id.* at *2, 14-15.

[123] *Id.* at *16.

[124] *Id.* (internal quotation marks and alterations omitted).

Because the defendants charged the challenged expenses to their Statek American Express credit cards, and also determined that Statek would pay those charged expenses, the defendants have the burden of showing that these charges represented legitimate business expenses of Statek.[125]

Once again, plaintiffs made a *prima facie* showing to warrant this burden allocation. In particular, after reviewing the "corporations' financial records that were available, including the Statek American Express credit card charge records," plaintiffs' expert prepared a summary of challenged charges and underlying statements that "were supplied to defendants almost two years before the trial," after which the defendants were deposed about the charges.[126] Discovery revealed that the challenged charges admittedly were made without following any sort of policy and included many charges that appeared on their face to be personal in nature, including for "stuffed animals, chocolate, flowers, cases of fine wine, fine china, videotapes, picture frames, Waterford and Baccarat crystal, furniture, Christmas decorations, and dry cleaning."[127]

The parties have identified four cases where this court applied *Technicorp*, with mixed results, in deciding whether to order an accounting or to allocate to a

---

[125] *Id.* at *25. Avande does not rely on the *Technicorp* court's disposition of the remaining claims involving Statek (for approximately $16 million), which the court sorted into over ten categories and sub-categories that it analyzed separately. *See id.* at *20-22, 27-50.

[126] *Id.* at *23.

[127] *Id.*

fiduciary the burden of demonstrating the fairness of a series or group of transactions. These cases are reviewed next in the order they were decided.

In *Carlson v. Hallinan*, a stockholder of CR Services Corp. (CR) alleged that CR's two other stockholders (Hallinan and Gordon) "caused CR to bear the expenses of other Hallinan entities."[128] In a post-trial decision, the court found that "Hallinan and Gordon exercise exclusive control over CR's funds," that they used that control to have CR pay for websites that benefitted other entities that Hallinan controlled, and that they "never documented expenses incurred by CR" on behalf of the Hallinan controlled entities.[129] Citing *Technicorp* with favor, the court concluded, based in significant part on "Plaintiffs' showing of definite instances where Defendants did not properly allocate expenses among Hallinan owned or controlled entities," that an accounting would be necessary "to determine the extent of the misallocation of expenses and the damages resulting therefrom."[130]

In *Sutherland v. Sutherland*, a stockholder demanded that certain directors and officers of a corporation and its subsidiary be required to "undertake a comprehensive accounting . . . to demonstrate affirmatively that the Companies' funds have not been used to finance any of [their] personal expenses."[131] In

---

[128] 925 A.2d 506, 536-37 (Del. Ch. 2006).

[129] *Id.* at 537.

[130] *Id.*

[131] 2010 WL 1838968, *4 (Del. Ch. May 3, 2010).

29

analyzing the issue, the court emphasized that in *Technicorp,* plaintiffs had "made a *prima facie* showing" that defendants "had diverted almost $12 million" before the court placed the burden on them to account for the funds; and that in *Carlson*, plaintiffs had demonstrated "definite instances" of "unaccounted-for dispositions" before the court ordered an accounting.[132] Finding that the stockholder had failed to make any such *prima facie* showing, the court rejected the request for an accounting and granted summary judgment in defendants' favor.

In *Zutrau v. Jansing*, the plaintiff challenged as improper approximately $51,000 out of over $1 million in expenses that the defendant had charged to his company credit card over a six-year span.[133] The defendant admitted that certain expenses were personal and the court found others to be business expenses, leaving approximately $28,000 of charges in dispute.[134] In a post-trial decision, the court found that "neither side has submitted convincing evidence as to the nature of these expenses," which meant that whether a breach of fiduciary duties occurred "will depend upon who bears the burden of proof."[135] The court refused to shift the burden under *Technicorp* or *Carlson*, reasoning that the plaintiff "has not made a *prima facie* showing that any of the remaining Amex charges were incurred improperly;

---

[132] *Id.* at *16 (internal quotation marks omitted).

[133] 2014 WL 3772859, at *27-28 (Del. Ch. July 31, 2014).

[134] *Id.*

[135] *Id.* at *28.

rather, her challenges to those charges are based on speculation and are not supported by substantial evidence."[136] Citing *Sutherland*, the court further explained that although the "lack of formal expense reporting is far less than ideal, . . . the relatively minimal nature of the personal expenses that Jansing has been shown to have charged to the Company over a span of six years is not sufficient to warrant shifting the burden of proof to him."[137]

In *CanCan Development, LLC v. Manno*, the court allocated to a defendant fiduciary (Manno) the "burden of accounting for compensation and expenses" that were self-interested transactions.[138] After adjudicating these transactions, the court separately considered challenges to "Manno's excessive spending on limousines, hotels, meals, and flights."[139] The court noted that "[o]rdinarily, these expenses would be subject to the business judgment rule," but found, citing *Technicorp*, that "Manno bore the burden at trial to establish the purpose, amount, and propriety of the disbursements" because "many of the expenses related to the interested transactions" it had adjudicated.[140] Although Manno never made that effort, the

---

[136] *Id.*

[137] *Id.*

[138] 2015 WL 3400789, at \*16 (Del. Ch. May 27, 2015).

[139] *Id.* at \*19.

[140] *Id.* at \*19-20 (internal quotation marks omitted).

31

court was able to determine damages by using an analysis of the expenses that the corporation's expert had prepared.[141]

In sum, the cases discussed above show that this court may place on a fiduciary the burden to demonstrate the fairness of a series or group of expenditures, or may order an accounting of such expenditures, where—as in *Technicorp*, *Carlson*, and *CanCan*—a plaintiff has made a *prima facie* showing based on *substantial* evidence that the expenditures in question are self-interested transactions. The fiduciary's exercise of control over the corporation's funds and records is a factor to be considered in the analysis. Where, by contrast, a plaintiff has failed to make such a *prima facie* showing—as in *Sutherland* and *Zutrau*—the court has refused to shift the burden of proof to the fiduciary or to order an accounting. In that event, potentially problematic transactions should be examined individually.

Turning to the facts of this case, Avande has failed to make the *prima facie* showing required to shift to Evans the burden of demonstrating the fairness of each of the expenses making up the Challenged Amount or to require an accounting of those expenses. More specifically, Avande has not provided substantial evidence that the transactions making up the Challenged Amount, which likely consist of thousands of individual expenditures incurred over a span of more than five years,

---

[141] *Id.* at *20. In another section of the opinion devoted to the corporation's waste claims, the corporation had the burden to overcome the business judgment rule. *See id.* at *20-21.

constitute self-interested transactions involving Evans. To the contrary, except for one *de minimis* transaction involving a scooter valued at approximately $3,500, Avande did not identify any transactions out of the approximately $4.7 million of expenses in question that appear to have personally benefited Evans.

As discussed below, the other five expenditures that Avande specifically challenges were not self-interested transactions but instead involved questionable payments to third parties. Even if, *arguendo*, the six specifically challenged transactions all were deemed to be acts of self-dealing, their total value— approximately $30,500—still would be so minimal relative to the total amount in question that shifting the burden of proof to Evans or ordering an accounting would be unwarranted. And, significantly, it was not for a lack of trying that Avande was only able to identify six problematic transactions. To the contrary, the Company's Chief Operating Officer spent an average of three hours a day over a ten-month period culling through Evans' emails to help build Avande's case against Evans.[142]

Several additional considerations support the court's decision not to shift the burden of proof or to order an accounting with respect to the Challenged Amount of expenditures. First, Evans did not have the sole authority to expend funds on behalf of Avande. The record shows, for example, that his fellow directors and officers

---

[142] Tr. 649-52 (Taciroglu).

(Kato and Ergun) and at least six other employees (Mine Ozbek, Ali Taciroglu, Donna Gentile, Carolyn A. Hammons, Luke Burchard, and Matthew Kelley) were authorized to and did use corporate credit cards.[143] Expenditures using these credit cards accounted for approximately $700,000 of the Challenged Amount.[144] Unlike in *Technicorp* and *CanCan,* moreover, Avande made no effort to isolate the charges attributable to Evans, or to determine from the face of the credit card statements whether the charges appeared to be business-related or personal in nature.[145]

Second, Evans did not exercise sole control over Avande's finances. He regularly forwarded to the board financial reports, budgets, and projections that delineated by category the amount of expenses the Company was incurring.[146] Any director thus was to free to inquire and take action if he had a concern about the Company's level of spending. Indeed, emails in the record reflect that when Kato requested back-up documentation for certain expenses, the information was

---

[143] Tr. 37-39 (Evans); *see, e.g.*, JX 18; JX 24; JX 25; JX 30; JX 47; JX 80; JX 105; JX 129; JX 183; JX 257; JX 308; JX 350; *see also* Tr. 627-28 (R. Evans) (acknowledging that the Challenged Amount would have included Kato's expenses related to Avande).

[144] Pl.'s Opening Br. 30 (quantifying charges on American Express and Chase Card Services credit cards at $419,552.21 and $281,410.61, respectively); Post-Trial Tr. 30-31 (representing that credit card charges are included within the Challenged Amount).

[145] *See Technicorp*, 2000 WL 713750, at *22-23; *CanCan*, 2015 WL 3400789, at *19-20.

[146] *See, e.g.*, JX 215; JX 259; JX 264; JX 277; JX 279A; JX 289; JX 302; JX 330.

provided to him.[147]  And, when the board became concerned about the Company's level of expenditures in December 2016, it implemented spending limitations.[148]

Third, common sense suggests that many of the expenses within the Challenged Amount would have had a legitimate business purpose.  As explained above, Rick Evans computed the Challenged Amount by deducting four items from the total amount of expenses Avande incurred from 2013 to January 2018, three of which were cash items:  (1) payroll expenses, (2) payments to Specialty Health, and (3) $116,312 of other expenses that exhibited "evidence of proper authorization" or of "business purpose."[149]  But it is inconceivable that the $116,312 in "other" expenses would capture anything close to the actual cost of operating the Company for five years after backing out payroll expenses and payments to Specialty Health.

Indeed, the financial reports and budgets that Evans regularly forwarded to Kato delineate numerous additional categories of expenses that logically would be necessary to operate Avande's business, such as:  IT (computer, internet and programming expenses), rent, telephone, utilities, insurance, professional fees (legal, accounting), travel and entertainment, non-payroll taxes, business licenses,

---

[147] JX 200; JX 213; JX 307.

[148] JX 198; Tr. 364-65 (Evans); Tr. 445-46 (Kato).

[149] JX 425 at 5.

bank fees, office supplies, and interest.[150] To use one example, the Company paid approximately $626,000 for programmers in 2016—more than five times the $116,312 of "other" expenses in Rick Evan's calculation.[151] These individuals would have been working under the direction of Ergun, who was responsible for building out and maintaining the Company's platform to conduct medical reviews.[152] Yet, according to Avande, Evans should be required to pay damages to reimburse the Company for its programming expenses (and innumerable other expenditures) even though such expenses facially had a business purpose and the record is devoid of evidence that Evans stood to benefit personally from them. There is no logic or equity to this position.

Finally, it bears mention that the expert case Avande planned to present at trial would not have been useful to make the *prima facie* showing of self-dealing necessary to warrant a burden shift or an accounting under *Technicorp* and its progeny. According to Avande, Rick Evans intended to opine that there was "no evidence proving, under the standards set by the IRS, that the funds [making up the Challenged Amount] were spent on legitimate Avande business."[153] In other words,

---

[150] *See, e.g.*, JX 214; JX 215; JX 259; JX 264; JX 277; JX 289; JX 302; JX 330 (native spreadsheets).

[151] JX 214 (native spreadsheet).

[152] Tr. 14 (Evans); Tr. 408 (Kato).

[153] Pl.'s Opening Br. 31.

Rick Evans intended to opine about expenses that the Company had deducted on its tax returns that the IRS might disallow based on the IRS's documentation standards.[154] Application of the IRS's standards to identify insufficiently documented expenses, however, does not mean that the expenses themselves benefitted Evans in a self-interested manner. It just means there is a risk that some of the Company's past deductions might be disallowed for lack of supporting documentation.[155]

* * * * *

For the reasons explained above, because Avande failed to make a *prima facie* showing based on substantial evidence that the expenditures within the Challenged Amount constitute self-interested transactions involving Evans, it would be inappropriate to shift to Evans the burden of demonstrating the fairness of each of those expenditures or to order an accounting of them. Accordingly, except for the six expenditures that Avande has specifically challenged, which are discussed next, Evans is entitled to judgment in his favor because the expenditures within the

---

[154] Tr. 607-08 (R. Evans).

[155] Avande apparently hoped to use Rick Evans' analysis to make the case that Evans "actions and omissions" exposed the Company to additional taxes and penalties if the deductibility of the allegedly insufficiently documented expenses were disallowed. *See* Pl.'s Pre-Trial Br. 27. Such a claim might have been advanced as a non-exculpated breach of the duty of care that Evans owed as an officer of Avande but, as noted above, the Company failed to fairly present such a claim. *See supra.* n. 103.

Challenged Amount are subject to the business judgment rule and the Company has not proven that any of them constitute waste.[156]

### 2. Specific Expenditures Avande Has Challenged

The Company specifically has challenged six expenditures within the Challenged Amount. In total, these expenditures add up to approximately $30,500. They are addressed next in three categories.

### a. Payments for Dr. Danhaive

Avande specifically challenges three payments totaling $18,280.20 that Evans authorized Avande to make for the benefit of Dr. Olivier Danhaive, a neonatologist who performed medical reviews for Avande.[157] Two of the three payments were made to the Lycee Francais de San Francisco to pay for tuition at a foreign language school that Danhaive's children attended: $7,605.20 on December 17, 2014, and $5,635 on February 9, 2017.[158] The third payment was made to a ballet school for Danhaive's children (the Academy of Ballet): $5,040 on October 4, 2017.[159]

---

[156] In its opening brief, Avande called out $218,529.79 of alleged reimbursements Evans received from Avande, which the court understands to fall within the Challenged Amount. Pl.'s Opening Br. 30. Defendants appended to their answering brief a chart identifying documentary support for each of these expenditures, Defs.' Answering Br. Ex. B, and defendants did not focus on this group of expenditures thereafter at post-trial argument.

[157] Tr. 45 (Evans).

[158] JX 62; JX 368; JX 224.

[159] JX 285.

Each of these three payments, in reality, was made to compensate Danhaive for consulting services he performed for Avande.[160] But instead of having the Company pay Danhaive directly, Evans directed that Company funds be used to pay Danhaive's personal bills. As part of this scheme, Evans explicitly instructed Omran, the DC Risk employee who served as Avande's bookkeeper, not to issue a Form 1099 to Dainhaive for the first payment, which was characterized falsely on Avande's books as a charitable "donation."[161] No Form 1099s are in the record for the other two payments as well.

Evans' initial testimony about these payments was not credible and shifted when he was pressed by the court, but the upshot is that he authorized the Company to make these payments in his capacity as Chief Executive Officer while knowing he was causing the Company to violate the law in doing so. Evans considers himself an "expert" in business management and is familiar with the legal obligation that a corporation owes to report income paid to a non-employee on a Form 1099.[162] Yet instead of having Avande pay Danhaive directly and issue Form 1099s to document his compensation from the Company, Evans intentionally engaged in subterfuge in plain disregard of the law. In short, insofar as the Danhaive payments are concerned,

---

[160] Tr. 156-57, 370-71 (Evans).

[161] Tr. 154-57 (Evans); 469-70 (Kato); JX 62; JX 368.

[162] Tr. 6, 109, 111-12 (Evans).

Evans acted in bad faith in breach of the duty of loyalty he owed as a fiduciary of the Company.[163]

"Delaware law dictates that the scope of recovery for a breach of the duty of loyalty is not to be determined narrowly."[164] Damages flowing from duty of loyalty breaches "serve the dual purposes of compensating for injury and deterring future breaches of the duty of loyalty"[165] and as such "are to be liberally calculated."[166] "Furthermore, once a breach of duty is established, uncertainties in awarding damages are generally resolved against the wrongdoer."[167]

Although it is difficult to determine precisely the level of harm to which the Company has been exposed as a result Evans' breach of duty, the record reflects that Avande currently is the subject of an IRS audit, that the IRS has requested documentation it has been unable to provide—including Form 1099s, and that a spotlight is now focused on Avande's compliance with IRS requirements.[168] Under these circumstances, and given the egregiousness of Evans' conduct, it is just to

---

[163] *Disney*, 906 A.2d at 67 (explaining that bad faith is shown "where the fiduciary acts with the intent to violate applicable positive law").

[164] *Thorpe v. CERBCO, Inc.*, 676 A.2d 436, 445 (Del. 1996).

[165] *OptimisCorp v. Waite*, 2015 WL 5147038, at *82 (Del. Ch. Aug. 26, 2015), *aff'd*, 137 A.3d 970 (Del. 2016).

[166] *Thorpe*, 676 A.2d at 444.

[167] *Thorpe v. CERBCO, Inc.*, 1993 WL 443406, at *12 (Del. Ch. Oct. 29, 1993).

[168] Tr. 592-95 (R. Evans).

award Avande damages in the amount of $18,280.20 for the three Danhaive payments at issue.

### b. The Scooter for Ergun

The next specific expenditure Avande challenges involves the Company paying Scooter Ricambi, a company in which Evans had an ownership interest, $3,537.50 in November 2015 as an "office expense" for a motor scooter that was provided to Ergun.[169]  According to Evans, who authorized this payment without Kato's knowledge, Ergun had asked for a vehicle from the Company and Evans suggested getting him a scooter instead.[170]

Because Evans stood on both sides of this transaction as a fiduciary of the buyer (Avande) and an owner of the seller (Scooter Ricambi), it is his burden to prove the entire fairness of the transaction.[171]  He has not done so.

With respect to the fairness of the price, Evans testified that Scooter Ricambi bought the scooter "wholesale for a very good price"[172] but Evans did not say what that price was, he provided no written evidence of what Scooter Ricambi actually

---

[169] JX 111; JX 113; JX 365; Tr. 468 (Kato); Tr. 44-45 (Evans).

[170] PTO ¶ 44; Tr. 44-45 (Evans); Tr. 468 (Kato).

[171] *See Oliver*, 2006 WL 1064169, at *18 (stating that when a fiduciary stands "on both sides of a challenged transaction" the fiduciary has the burden to prove entire fairness).

[172] Tr. 266 (Evans).

paid for the scooter, and he submitted no evidence of its fair market value at the time it was given to Ergun.

With respect to fair dealing, Evans' contention that "Evans and Ergun, together constituting a majority of Avande LLC's [board] *de facto* approved the purchase" of the scooter, misses the point—by a lot.[173]  Like Evans, Ergun also had a personal interest in the transaction as the recipient of a scooter paid for by the Company.  The relevant point is that the use of Company funds to purchase the scooter was concealed from the only disinterested member of the board—Kato.[174]

"In cases where the defendant breaches the duty of loyalty, the infringing party must disgorge all profits and equity from the usurpation."[175]  This is because "the imposition of damages should eliminate the possibility of profit flowing to defendants from the breach of the fiduciary relationship."[176]  Given his failure to prove that the use of Company funds to purchase the scooter was entirely fair, Evans is liable for damages equal to what Avande paid for the scooter:  $3,537.50.

---

[173] Defs.' Answering Br. 36.

[174] Tr. 468 (Kato).

[175] *In re Mobilactive Media, LLC*, 2013 WL 297950, at *24 (Del. Ch. Jan. 25, 2013).

[176] *Int'l Telecharge, Inc. v. Bomarko, Inc.*, 766 A.2d 437, 441 (Del. 2000).

42

### c. Payments to Law Firms

The final two expenditures that Avande specifically challenges involved payments of Company funds that Evans authorized to be made to two different law firms. The two payments total $8,650.

The first payment was made in March 2015 to The Oxford Law Firm, a firm with trust law expertise that had been representing Ergun, in the amount of $5,000. The purpose of the expenditure was to pay a retainer for Ergun, who was going through a divorce and who was "broke" at the time, to retain a trust attorney.[177] According to an email that Ergun sent Evans, he needed counsel to "help structure [his] voting shares [in Avande LLC] such that they are protected in the future after [his] divorce stipulation."[178]

The second payment was made in April 2016 to Fragomen Del Rey Bernsen, a law firm specializing in immigration, in the amount of $3,650.[179] The Fragomen firm represented Ali Ozden, an employee of Avandel—Ergun's company—who was going through the immigration process in connection with relocating from Turkey to the United States to do programming work for Avande.[180]

---

[177] Tr. 225-26 (Evans); JX 75.

[178] JX 75 at AVANDE0000784.

[179] JX 140; JX 366; JX 377.

[180] Tr. 49 (Evans).

43

Because Evans had no personal interest in either of these transactions, they are presumptively governed by the business judgment rule.[181] Avande, however, has not proven that either transaction was an act of bad faith or waste. To the contrary, although reasonable minds could disagree about whether these expenditures were the best use of corporate funds, neither expenditure was irrational and neither was "caused to effect a transaction on terms that no person of ordinary, sound business judgment could conclude represent a fair exchange."[182]

With respect to the Oxford firm payment, the retention agreement identifies Avande, LLC as the client and Evans credibly testified that the Company benefited from receiving advice to ensure that Ergun's divorce would not disrupt the Avande, LLC's ownership structure, and that Ergun paid the firm separately for services it provided to him personally.[183] With respect to the payment to the Fragomen firm, the Company benefited by ensuring that "one of [its] senior programmers . . . who was critical" to completing a software project for Avande could come to the United States to do so.[184]

---

[181] *See Trados*, 73 A.3d at 36 (the business judgment rule applies when the decision makers "were disinterested and independent").

[182] *Steiner*, 1995 WL 441999, at *1.

[183] JX 74; Tr. 163-67 (Evans).

[184] Tr. 49 (Evans).

For the reasons explained above, Avande has failed to prove that Evans breached his fiduciary duties with respect to either of the two law firm expenditures.

### D.    Self-Interested Transactions Involving DC Risk

Avande's second category of alleged damages consists of $235,845.83 of payments that Avande made to DC Risk, which is wholly-owned by Evans.[185] According to Avande, this amount falls outside of the Challenged Amount[186] and includes expenses for "Bookkeeping, Travel reimbursement, Microsoft office & adobe reimbursement."[187]

Evans does not contest that Avande paid $235,845.83 to DC Risk, and both parties focus on two types of expenditures when discussing the payments Avande made to D.C. Risk:  charges for (i) bookkeeping services that DC Risk employee Susan Omran performed for Avande and (ii) brokerage commissions for insurance policies DC Risk placed for Avande.[188]  DC Risk billed Omran's services to Avande on an hourly basis at $35 or $40 per hour, which Evans claims was below the market

---

[185] Tr. 5 (Evans).

[186] Post-Trial Tr. 23.  It is unclear to the court why this amount fell outside of the Challenged Amount but defendants did not dispute this contention and, even if the payments to DC Rick were within the Challenged Amount, the court would resolve the dispute concerning them in the manner set forth herein.

[187] JX 396.

[188] Pl.'s Opening Br. 33-35; Defs.' Answering Br. 46-49.

rate in the San Francisco.[189]  According to invoices in the record, DC Risk charged Avande a total of $89,947.50 for bookkeeping services provided from December 2013 to February 2018, although some invoices appear to be missing.[190]  The record also contains DC Risk invoices for insurance policies ($28,587.11)[191] and travel reimbursement ($1,510.34).[192]  Kato knew that DC Risk purchased insurance policies for Avande, but claims he was unaware that DC Risk was earning brokerage commissions for doing so.[193]  The total amount of DC Risk invoices in the record appears to be approximately $120,000.

Although the court does not have a complete picture of the expenses that make up the entire $235,845.83 at issue, two things are clear.  First, Evans stood on both sides of these transactions.  He was a fiduciary of Avande who authorized the payments on one side, and the sole owner of DC Risk that received the funds on the other side.  Thus, all of the transactions at issue are self-interested.  Second, as to Omran's bookkeeping services, which comprise a significant chunk of the amount in dispute and which was the focus of the trial insofar as expenditures involving DC

---

[189] Tr. 25 (Evans).

[190] *See* JX 33; JX 40; JX 50; JX 63; JX 69; JX 72; JX 77; JX 82; JX 95; JX 100; JX 107; JX 117; JX 122; JX 128; JX 137; JX 143; JX 149; JX 155; JX 164; JX 171; JX 177; JX 185; JX 193; JX 212; JX 223; JX 229; JX 235; JX 245; JX 255; JX 258; JX 261; JX 268; JX 283; JX 294; JX 300; JX 309; JX 334.

[191] JX 101 ($14,055.11); JX 181 ($14,532).

[192] JX 268 ($1,510.34).

[193] Tr. 448-49 (Kato).

Risk are concerned, the evidence presented at trial raised more questions than it answered.

Omran was the sole person who performed bookkeeping for Avande.[194] She would generate an invoice for her time, draft a check from Avande to DC Risk based on that invoice, and Evans would approve it.[195] Significantly, Omran simultaneously performed bookkeeping services for several other entities that Evans had an ownership interest in and/or operated.[196] In that regard, Omran acknowledged that the time she billed to Avande was "just [a] ball park figure" because she "always bounced back and forth" and "was always interrupted with things to do for different companies."[197] Just as concerning, a number of the invoices appear suspicious on their face. For example, according to the invoices, Omran billed Avande precisely four hours per day every day in October and November 2014, and the exact same number of hours per day during several other long stretches.[198]

---

[194] Omran Dep. 162.

[195] Omran Dep. 163-66.

[196] The number of entities fluctuated during the relevant period. In 2016, Omran split her time among five entities. JX 458. Evans later acquired Podiatry Plan, for which Omran also performed work. Omran Dep 130.

[197] Omran Dep. 129.

[198] JX 63 (billing 4.0 hours per day in October and November 2014); JX 69 (billing 5.5 hours per day for 21 days in January 2015); JX 72 (billing 5.0 hours per day for 20 days in February 2015); JX 95 (billing 5.0 hours per day for 21 days in August 2015).

Also significant, Omran testified during her deposition that she kept a spreadsheet reflecting the allocation of her time among Evans' various entities, but no such spreadsheet was produced during discovery.[199] Defendants, who elected not to call Omran to testify at trial, produced one spreadsheet (for 2016) *during trial* and never produced spreadsheets for any other years.[200]

For the reasons explained above, the court finds that Avande made a *prima facie* showing at trial based on substantial evidence that the bookkeeping charges it paid to DC Risk were self-interested transactions and that the billing records appear suspicious. For their part, defendants did not prove the fairness of those charges and their production of a single spreadsheet during trial is problematic, because it was both untimely and incomplete. Given these findings concerning a substantial portion of the amount at issue, and given the lack of visibility that exists concerning the balance, the court will order an accounting.[201]

The accounting will examine each of the Company's payments to DC Risk before Evans' termination as CEO and determine to what extent, if any, they were unfair under the standards of Delaware law for self-interested transactions. The

---

[199] Omran Dep. 127-30.

[200] JX 458. Avande was given a chance to re-depose Omran, but declined to do so.

[201] *Carlson*, 925 A.2d at 537 (ordering an accounting where defendants exercised "exclusive control" over expenses, plaintiffs showed definite instances where Defendants did not properly allocate those expenses, and there was inadequate documentation of the expenses).

48

parties shall meet and confer to select a qualified person to conduct the accounting and defendants shall bear the entire expense of the accounting.[202] DC Risk shall be jointly liable with Evans as an aider and abettor for any damages that are assessed as a result of the accounting, as DC Risk's knowing participation can be inferred from the actions of Evans, its sole owner and operator.[203]

### E. Disgorgement of Evans' Compensation

Finally, Avande asks that Evans pay damages in the amount of $445,815.50, which equals 50% of the compensation he received from the Company before his termination as CEO. The argument goes as follows: Based on Evans' estimate that he spent approximately 10-20 hours per week doing work for DC Risk while also working for Avande, and "[a]ssuming a 40-hour work week," he should disgorge "time working on his personal businesses."[204] The argument is meritless.

The purpose of disgorgement is to deter "acts of conscious wrongdoing and breaches of a fiduciary's duty of loyalty . . . by requiring the wrongdoer to disgorge

---

[202] *See Carlson v. Hallinan*, 2006 WL 1510759, at *2 (Del. Ch. May 22, 2006) (defendants ordered to "bear the expense of the entire accounting," because "they failed to satisfy [their] burden and were found to have breached their fiduciary duties" by entering into self-interested transactions that were not entirely fair).

[203] *Carlson*, 925 A.2d at 542 (concluding that "Hallinan's knowledge as a director and officer of both Main Street and TC is imputed to them" for purposes of satisfying the knowing participation element of an aiding and abetting claim against them) (internal footnotes omitted).

[204] Pl.'s Opening Br. 43-44.

any profit made as a result of such wrongful conduct."[205]  In order to disgorge Evans' salary, Avande must establish that Evans' "misconduct somehow unfairly increased his compensation, such as could occur if an investment manager falsely recorded gains on his positions and pumped up his resulting performance-based bonus."[206]

There is no evidence that any of Evans' misconduct increased his salary.  Nor is there any ground to reduce his salary to account for the estimated 10-20 hours Evans spent on DC Risk each week at a particular point in time.[207]  As noted above, Avande, LLC's operating agreement expressly permitted its managers to engage in other business ventures, this practice was permitted to continue after the formation of Avande, Inc., and, indeed, Kato was aware throughout that Evans was working for DC Risk while serving as Avande's CEO.[208]  Avande's 40-hour work week assumption, furthermore, is speculative and belied by Evans' uncontroverted testimony that at the time he was spending 10-20 hours per week on DC Risk, he also was working "[o]n average, 40 hours a week" or between a minimum of 30

---

[205] *Pike v. Commodore Motel Corp.*, 1986 WL 13007, at *3 (Del. Ch. Nov. 14, 1986).

[206] *Seibold v. Camulos P'rs LP*, 2012 WL 4076182, at *25 (Del. Ch. Sept. 17, 2012).

[207] Evans Dep. 167 (stating that in February of 2016 he worked "anywhere between 10 and 20 hours a week" on DC Risk).

[208] *See supra* I.C.; Tr. 447 (Kato).

hours and a maximum of 60 hours per week for Avande.[209] In short, no factual or legal basis exists on which to order disgorgement of any of Evans' compensation.

## IV. CONCLUSION

For the reasons explained above, Avande is entitled to damages from Evans in the amount of $21,817.70, as well as pre- and post-judgment interest, both at the Delaware legal rate.[210] Avande also is entitled to an accounting with respect to all payments that Avande made to DC Risk as described above. Defendants are entitled to judgment in their favor on all other claims. The parties are directed to confer and to submit a form of order to implement this decision within ten business days. Each party will bear its own costs.

**IT IS SO ORDERED.**

---

[209] Evans Dep. 167-68 (stating his hours as of February 2016).

[210] *See Valeant Pharmaceuticals Int'l v. Jerney*, 921 A.2d 732, 755 ("[A] successful plaintiff is entitled to interest on money damages as a matter of right from the date liability accrues.").